## UNITED STATES v. AMOROSA.

### SAME v. SILANO.

#### Nos. 9431, 9434.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 6, 1948.

Decided April 6, 1948.

Abraham J. Slurzberg, of Jersey City, N. J. (Nicholas Carella, of Lyndhurst, N. J., and Bennett A. Robbins, of Jersey City, N. J., on the brief), for appellants.

Edgar H. Rossbach, of Newark, N. J., for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellants were convicted at a joint trial but under separate indictments, of theft of freight in interstate commerce.[1]

There was testimony in the case that as a result of a chance talk in a New York dance hall between Anthony and Steve Menna (brothers) and Edward Manupelli and Steve Montalbano concerning possible theft of merchandise from trucks "that lay over" in Jersey City, the Mennas contacted appellant Silano who said he could get them a tractor and that he would have to look around and make sure where he could get the tractor and "who he can get to pull the whole job." The prospective theft was explained to Silano. Later Silano in order to obtain the tractor took the Mennas to appellant Amorosa and another person named Jake Maislich and the proposed robbery was discussed with them. This was at least twenty days prior to the actual robbery. There was another meeting between the five two days later at which time they (Silano, Maislich and Amorosa) definitely said they could get the tractor. They "were supposed to handle everything after we [the Mennas] got word from the Jersey boys [Manupelli and Montalbano] that the truck had arrived." On May 22, 1946, the day of the robbery, the same five were together in New York and then William Kohut came along with a tractor. Amorosa, Menna thought, introduced Kohut who "was all set". The Mennas, Maislich and Amorosa went in one automobile to Jersey City. Silano and someone unidentified went in another and Kohut

---

[1] The statute in effect at the time of this occurrence was 43 Stat. 793, 18 U. S.C.A. § 409 and reads in part as follows:

"§ 409. Larceny, etc., of goods in interstate or foreign commerce; penalty. *Whoever* shall unlawfully break the seal of any railroad car containing interstate or foreign shipments of freight or express, or shall enter any such car with intent in either case to commit larceny therein; or whoever *shall steal or unlawfully take, carry away, or conceal,* or by fraud or deception obtain *from any* railroad car, station house, platform, depot, wagon, *automobile, truck, or other vehicle,* or from any steamboat, vessel, or wharf, *with intent to convert to his own use any goods or chattels* moving as or which are a part of or which constitute an *interstate* or foreign *shipment* of freight or *express,* * * * ". (Emphasis ours.) (The above law has been currently changed by 60 Stat. 656 passed July 24, 1946).

drove over in the tractor. The Mennas, Maislich and Amorosa waited in Anthony Menna's car near where the tractor was supposed to be. It came along with a trailer attached to it and a suspicious looking car following it. For a time contact with the trailer and tractor was lost, then finally they located it on the highway and saw Silano near it also. Amorosa then led the cars to a house in Madison, New Jersey, meanwhile picking up the person who was owner of or, at least, in possession of, that house. At the house Anthony Menna, Maislich and Silano unloaded the trailer and piled the stolen merchandise, consisting of rum and cigarettes, in the cellar. Amorosa said that since the "load was different than specified he was going to have to take a little longer in disposing of it but he said not to fear that he had the proper people in mind to get rid of it."

The Mennas, Montalbano, Manupelli, Kohut and Maislich were named in the same indictment as Amorosa. Silano was indicted by himself. The Mennas, Montalbano, Manupelli and Kohut all pleaded guilty. Anthony Menna, Montalbano and Manupelli testified for the government. Amorosa did not take the stand. Silano testified saying that he was in Brooklyn the night of the robbery.

On behalf of Silano it is argued that the indictment against him is defective. The indictment charged that:

"Pacifico Silano did willfully and unlawfully steal, take and carry away from a certain motor truck, in the custody and possession of the Motor Freight and Transportation Company, with intent to convert to his own use, certain goods and chattels more particularly described and consigned as follows: * * *"

The suggested defect is that there is no charge that the acts specified were "feloniously" and "knowingly" done by Silano as is stated in the Amorosa indictment. Concededly the question was not raised below but, even so, may be considered on appeal. United States v. Max, 3 Cir., 156 F.2d 13. The indictment of course must contain the elements of the crime alleged. Hagner v. United States, 285 U.S. 427, 433, 52 S.Ct. 417, 76 L.Ed. 861. This indictment charges the crime in the applicable statutory language. Section 409, the foundation of the indictment, does not contain the words "knowingly" or "feloniously", but does have the statutory "unlawfully" and in addition the world "wilfully". With "unlawfully" included, the omission of "knowingly" was not a fatal defect. Wheatley v. United States, 4 Cir., 159 F.2d 599, 600. And under Azuma Kubo v. United States, 9 Cir., 31 F.2d 88, stressed by appellant "unlawful" is an adequate substitute for "felonious". That case holds, 31 F.2d at page 89, that "the taking must be charged to be felonious, wrongful, *or* unlawful." (Emphasis added.) Even at common law, where the criminal intent was averred, the lack of the precise word "felony" was not necessarily ground for quashing an indictment which followed the terms of the statute. United States v. Staats, 8 How. 41, 45, 46, 49 U.S. 41, 45, 46, 12 L.Ed. 979. Under Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, the indictment "shall be a plain, concise and definite written statement of the essential facts consituting the offense charged. * * * It need not contain * * * any * * * matter not necessary to such statement." Despite the skilled argument advanced on behalf of the appellant it is patent that the omission of the words complained of is inconsequential. As said in a late case passing on quite similar facts, "There could be no doubt or uncertainty in the minds of any of the defendants as to the nature of the crime charged to them. It is true, as urged, that the indictment does not contain the words 'knowingly, wilfully, feloniously, intentionally or unlawfully' but neither do the applicable statutes contain such words. It is unnecessary for an indictment to contain such formal words where the allegations thereof necessarily or fairly import guilty knowledge." Madsen v. United States, 10 Cir., 165 F.2d 507, 509, 510. Cf. Randolph v. United States, App.D.C., 165 F.2d 20.

The next question raised concerns Amorosa alone: It revolves around two photographs of him made after he was taken into custody. The full face picture bears a Federal Bureau of Investigation serial number on it. Those pictures were

marked in evidence with trial counsel for Amorosa being asked by the court, "Is there any objection to these pictures?" Counsel replied, "No objection." The trial judge in his charge instructed the jury as to the F.B.I. number on the picture, "You are not to infer because of that number that the defendant is guilty of this crime or of any other crime. In other words, you are to predicate no finding of fact on the mere fact that on the front of the picture there appears this F.B.I. number. You will, for the purposes of this case, completely disregard the fact that one of the pictures bears a number." The pictures were offered by the government as representative of Amorosa's appearance at the time he was arrested on the questions of his flight and his efforts to conceal his identity.

Counsel again make a carefully prepared presentation of this point but have very little to go on. The situation is completely unlike that in United States v. Brandenburg, 3 Cir., 155 F.2d 110, where writings on the backs of prescriptions in evidence which were unknown to either counsel and the court inadvertently were given to the jury. Though the picture bearing the F.B.I. number went into evidence without objection the court of its own motion, as above quoted, disposed of any stigma that might attach to it. Hatchet v. United States, 54 App.D.C. 43, 293 F. 1010, can hardly be said to have any bearing here because in that matter the photograph related to another arrest and brought a previous criminal record into the trial. And State v. Rombolo, 89 N.J.L. 565, 99 A. 434, does not help appellant for there the photographs contained writings about past crimes.

█ It is further asserted that the photographs were used by the government to establish that Amorosa had dyed his hair at the time of the picture to avoid arrest. This, it is claimed, amounted to appellant's being forced to testify against himself contrary to the Fifth Amendment. But the pictures had not been obtained unlawfully. They were part of the routine identification process at the time of arrest. Such pictures are permissible on the same reasoning as are finger prints. Cf. United States v. Kelly, 2 Cir., 55 F.2d 67, 70, 83 A.L.R. 122.

The government rightfully had possession of the pictures and used them for a proper evidential purpose. Fuller v. United States, 2 Cir., 31 F.2d 747, certiorari denied 280 U.S. 556, 50 S.Ct. 17, 74 L.Ed. 612, well illustrates the thought. In that case papers had been subpoenaed by state authorities for use in a state investigation. The federal government then subpoenaed them from the state for federal prosecution purposes. To the complaint of the owner of the papers that the latter were being used to incriminate him, the court said, 31 F.2d at page 748: "The privilege of the defendant was not broad enough to protect him from the production by others of his private books or papers, when they were found in the possession of a third party; * * *". Compare the similar law in cases where the material used had left the defendant's hands voluntarily before its use in the trial had been anticipated. Perlman v. United States, 247 U.S. 7, 15, 38 S.Ct. 417, 62 L.Ed. 950; Schauble v. United States, 8 Cir., 40 F.2d 363, 365; Davis v. United States, 5 Cir., 138 F.2d 406, 407. And on the general limits of Constitutional immunity in this regard, see the recent case of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098.

█ The next contention for the appellants is that at most under the evidence they would be guilty as accessories after the fact. The proofs, it is claimed, did not show that appellants aided and abetted in the commission of the robbery and therefore it is argued that they could not be held under the indictments as principals. This does not fit in with the testimony above outlined which if believed indicates that the appellants arranged the actual removal of the trailer containing the merchandise. Amorosa, brought into the group by Silano, guided the tractor drawn trailer to the house in New Jersey where it was unloaded, Silano assisting; Amorosa then said he would dispose of the stolen goods. All that bespeaks principals in this crime, not two people coming on the scene after the event. Even if they only aided and abetted they could still be convicted as principals. 18 U.S.C.A. § 550. The absence of the appellants from the immediate scene of the

taking is not enough to defeat their conviction as principals. United States v. Sall, 3 Cir., 116 F.2d 745, 747.

█ It is suggested that error was committed in connection with the government's examination of its witness Manupelli, one of the defendants who had pleaded guilty. That witness was vague about the dance hall talk and the district attorney had him identify a written statement signed by him and admit that it reflected the truth. The government then pleaded surprise and asked "permission to direct the witness' attention to certain statements contained in that statement." The court suggested that the direct examination be further pursued. It was, the witness testifying at some length thereafter. There was no further reference to the statement. No attempt was made to mark the statement in evidence or to use any of its language. The trial judge specifically stated that he would not permit the district attorney to make use of the statement at that time. Presumably the further testimony of the witness did away with any necessity for pressing the impeachment attempt. We fail to see error in this episode. The request of the district attorney was his right. United States v. Maggio, 3 Cir., 126 F.2d 155, 157, 159. The denial of the request was within the court's discretion.

Counsel contends that the result of the trial judge's interrogation of government witnesses "was to create fixed impressions in the minds of the jurors and thus prevent them from exercising an impartial judgment." Four instances are cited. In the first of these, the witness Montalbano was telling of the conversation in the dance hall he and his friend Manupelli had with two then strangers, the Mennas. In an answer on direct examination he said that he told the Mennas "about this truck". The court then wanted to know. "How did you and Menna come to talk about trucks at all? What led to your conversation about trucks?" And pursued that inquiry for several questions until he asked, "Did they tell you why they were interested in trucks?" The witness answered, "I don't remember." The second incident is lifted out of its context. It has to do with the court's asking Montalbano, "Who was the first one who suggested that this truck was going to be hijacked or taken and when was it discussed?" This in fact had been prompted by the witness having just stated on direct examination, "Well, we were going to take the truck." The third item concerned the court's effort to find out if the dance hall talk was the first time such a theft had been discussed. This was while Manupelli was on the stand and he said, "It all started from there." Objection is here made to the court's use of certain trade terms principally "hijacking" but it cannot pass unnoticed that the previous witness, Montalbano, had been asked on defense cross examination about "having a truck hijacked" and a truck "that could be hijacked profitably." The final testimony sequence is palpably of no consequence and needs no comment.

█ The questions of the trial judge above referred to were obviously for the purpose of developing facts helpful to an intelligent understanding of the matter not only by him but by the jury. He has no more important duty than this. Simon v. United States, 4 Cir., 123 F.2d 80, 83. And the interrogation of witnesses did not constitute error. Moore v. United States, 5 Cir., 132 F.2d 47. It is the trial court's duty "to see that all the truth is brought out so that the jury can arrive at a true verdict." United States v. Lee, 7 Cir., 107 F. 2d 522, 529. Making certain that there existed no misapprehension regarding his questions or any comment of his in the course of the trial, the trial judge in this case instructed the jury:

"I charge you that the fact that I, as presiding judge at this trial, saw fit in some instances to direct questions to certain of the witnesses in the case, must not influence you in any way in your deliberations. The fact that I saw fit to direct such questions does not indicate in any way that I have any opinion one way or the other as to the guilt or testimony given by such witnesses. What credit or belief is to be given to the respective witnesses both for the Government and for the defense, must be determined by you and you alone."

As to any possible comment of his during the trial, the judge further told the jury "to disregard all comments made by the

court" as not being evidential and having no probative value.

■ Finally complaint is made in several particulars of the court's charge. It is said that the jury was improperly instructed as to the elements of the offense because the court told the jury "for all practical purposes [to] treat the two indictments as one". It is insisted that there was no similarity between the indictments since the words "feloniously" and "knowingly" did not appear in the one against Silano alone. This argument was made and rejected under point one. Another objection is that the elements of the offense were not charged. A reading of the charge reveals that for two pages thereof the pertinent parts of the statute constituting the crime were carefully and competently analyzed. The remaining objections to the charge are of even less substance than those referred to. They need not be dealt with at length. The charge was full and fair and is not open to valid objection.

The judgments of the District Court will be affirmed.