UNITED STATES of America

v.

George BARROW, a/k/a "Skinny Barrett" et al.

Cr. No. 20997.

United States District Court
E. D. Pennsylvania.

Dec. 18, 1962.

839

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., Thomas M. McBride, George Robert Blakey, Special Attys., Dept. Justice, Washington, D. C., for plaintiff.

Morton Witkin, Witkin & Egan, Philadelphia, Pa., for defendants George Barrow, Dominick Di Caprio, Benny Bonanno, Frank Loscalzo.

Angelo D. Malandra, Camden, N. J., for defendants Pasquale Pillo, Fred Di Patrizio, Rocco Grassi, Charles Hunt, John Marzilli, Joseph Mattia, Michael Recchia, Querino Dentino.

Samuel Kenin, Philadelphia, Pa., for defendant James Gatto.

Samuel R. Liever, Liever, Hyman & Potter, Reading, Pa., for defendant Alfonso Comito.

Louis Lipschitz, Philadelphia, Pa., for defendant Anthony La Monica.

JOSEPH S. LORD, III, District Judge.

At the very core of organized crime and racketeering in the United States are gambling, prostitution, liquor and narcotics. In 1961, Congress received the Attorney General's program to curb organized crime, pursuant to which a number of acts were passed. One of these was 18 U.S.C.A. § 1952 which provides in pertinent part:

"(a) Whoever travels in interstate or foreign commerce or uses any facilities in interstate or foreign commerce, including the mail, with intent to * * *

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, .

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion or bribery in violation of the laws of the State in which committed or of the United States. * * * * "

The 15 defendants before us stand indicted under that Act and also under 18 U.S.C.A. § 2 [1] and 18 U.S.C.A. § 371.[2] The defendants have filed various motions: (1) to dismiss the indictment; (2) to suppress evidence; (3) for bills of particulars; (4) for severance. We consider here only the first two motions.

The case is set against the green baize backdrop of a large dice game in Reading, Penna.[3] According to the indict-

---

1. "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

2. "If two or more persons conspire either to commit any offense against the United States, * * * and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

3. In violation of 18 P.S. §§ 4603, 4605 and 4606.

ment, Pillo, Di Patrizio and Mattia were "laddermen",[4] Marzilli, Hunt, Grassi and Recchia were "dealers", and Dentino and La Monica were "luggers".[5] The other defendants (except Comito, who is charged only in the conspiracy count) are charged with willfully causing others to travel and aiding and abetting. All are charged in Count I with conspiracy with each other, with named but unindicted co-conspirators and with other persons unknown to the Grand Jury.

## I.

### THE MOTION TO DISMISS

▉▉ Defendants contend that despite its broad language, the Act was not intended to apply to the factual situation before us where, as here, defendants are present at the scene of the operation and subject to local prosecution. Rather, they say the Act was intended to catch individuals who have interests in gambling operations but are not subject to local prosecution because they live in resort towns far from the scene of operation and manage their enterprises through couriers and messengers who travel across state lines between the proprietors, the operation, and other branches. That this was one of its purposes cannot be doubted. But the terms of the Act evince no intent to limit its coverage so narrowly. The clear, unmistakable language reaches those who travel in interstate commerce intending to facilitate the illegal business activity, in this case gambling. It includes by its terms "[w]hoever travels in interstate * * * commerce * * * with intent to * * * facilitate the * * * carrying on, of any unlawful activity,[6] and thereafter" does facilitate or attempt to facilitate the unlawful activity.

Certainly defendants traveled in interstate commerce from New Jersey to Pennsylvania.

▉ Webster defines "facilitate" as "to make easy or less difficult": see United States v. One 1950 Buick Sedan, 231 F.2d 219, 222 (C.A. 3, 1956). In Platt v. United States, 163 F.2d 165 (C.C.A. 10, 1947), the court said, at page 167:

"* * * * The word 'facilitate' appears in many federal statutes. In none of them is it defined, but the presumption is that when Congress used this word, it ascribed to it its ordinary and accepted meaning. * * * *"

▉▉ Clearly, those who watch over the conduct of a dice game (the laddermen), those who roll the dice (the dealers), and those who carry the participants (the luggers) facilitate the "carrying on" of the game. It is perhaps an understatement to say that we find it difficult to imagine a dice game without someone to bet or without someone to roll the dice. Defendants argue that at least as to the laddermen and the dealers, the interstate travel did not facilitate the dice game. This, however, is to misread the statute. Its language does not require that the *travel* facilitate the illegal activity; it requires merely that the *person traveling* have the intent to and actually facilitate or attempt to facilitate such activity.

▉ Defendants refer to certain isolated statements allegedly made during the legislative hearings. However, it is neither necessary nor proper for a court to refer to legislative history where the words of a statute are clear and unambiguous, and where construction according to the words used does not lead to an absurd result. In United States v. Missouri Pacific Railroad Company, 278 U.S. 269, at page 278, 49 S.Ct. 133, at

---

4. This term has not been defined of record, but we understand it to mean a man who oversees the game from the vantage point of a high chair.

5. Those who transport customers to the game.

6. Under subsection (b) of § 1952 "unlawful activity" means, inter alia, "* * * any business enterprise involving gambling * * *."

page 136, 73 L.Ed. 322 (1929), the Court said:

> " * * * But where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed * * * "

See also Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917); Hamilton v. Rathbone, 175 U.S. 414, 20 S.Ct. 155, 44 L.Ed. 219 (1899).

So here, defendants are covered by the plain language of the Act and that result is not absurd. We hold that the acts charged constitute an offense under § 1952.

Defendants also claim that the indictment is defective in that it fails to specify that the aiders and abetters did so knowingly. While it is true that an alleged aider and abetter must act with knowledge, United States v. Turnipseed, 272 F.2d 106 (C.A. 7, 1959), this is a matter of proof and not one which must be alleged in the indictment. The section involved, 18 U.S.C.A. § 2, does not even include such language. Cf. United States v. Amorosa, 167 F.2d 596 (C.C.A. 3, 1948).

Defendants further complain that nowhere in the conspiracy count is the game alleged to be a "business enterprise", this language being used in the Act. The detail necessary in an indictment charging commission of the substantive offense is not necessary in a conspiracy indictment. Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927); Davis v. United States, 253 F.2d 24 (C.A. 6, 1958). The indictment here sufficiently identifies the offense which defendants are alleged to have conspired to commit.

Lastly, defendants contend that the statute is unconstitutional as applied to these defendants.

Ever since Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824), it has been recognized that Congress has plenary power over interstate commerce. Cf. Champion v. Ames, 188 U.S. 321, 23 S. Ct. 321, 47 L.Ed. 492 (1903); Caminetti v. United States, 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917). It may deny the facilities of that commerce to persons or things which it deems inimical to the general welfare, even though it could not act as to those matters within a state itself. In Willoughby, "Constitution of the United States", Vol. 2, p. 977, speaking of the Lottery Case,[7] it is stated:

> " * * * That the real purpose of the act was to discourage a type of business or enterprise of which Congress disapproved, but over which, within the States, it had no direct powers of regulation, was not denied. The question, then, was, whether the measure could be constitutionally defended as an exercise of power granted by the Commerce Clause. In the case of Champion v. Ames the court answered this question in the affirmative. * * * "

In Hoke v. United States, 227 U.S. 308, at page 323, 33 S.Ct. 281, at page 284, 57 L.Ed. 523 (1913), upholding the constitutionality of the Mann Act, the court said:

> " * * * The principle established by the cases is the simple one, when rid of confusing and distracting considerations, that Congress has power over transportation 'among the several States'; that the power is complete in itself, and that Congress, as an incident to it, may adopt not only means necessary but convenient to its exercise, and the means may have the quality of police regulations. * * * "

---

7. Champion v. Ames, 188 U.S. 321, 23 S. Ct. 321, 47 L.Ed. 492 (1903).

We see no distinction in principle between congressional power to prohibit one from transporting an article or another person, and its power to prohibit the use of commerce by the illegal actor himself. The Fugitive Felon Act, 18 U.S.C. § 1073, involves similar principles. In Simmons v. Zerbst, 18 F.Supp. 929 (N.D.Ga.1937), the court said of this Act, at page 930:

" * * * Only federal officers can be given authority to act over the country as a whole, and the withdrawal by Congress of the facilities of interstate commerce from such criminals is an appropriate means to a proper end, and the most effective way to prevent the use of interstate commerce to defeat justice.

"As stated by the Supreme Court in Hoke v. United States, 227 U.S. 308, 321, 33 S.Ct. 281, 283, 57 L.Ed. 523, * * * 'there is a domain which the states cannot reach and over which Congress alone has power; and if such power be exerted to control what the states cannot, it is an argument for—not against— its legality. Its exertion does not encroach upon the jurisdiction of the states.' * * * "

Just as Congress may make it a criminal offense to cross a state line after the commission of a strictly local offense, similarly it has the power to make it a criminal offense to cross states lines to commit a crime. The Constitution is not a rigid set of rules, but rather a document whose enduring strength lies in its inherent flexibility to meet new and changing situations. The framers wisely anticipated that conditions would arise that they could not anticipate. The broad grant of power to Congress is a well-spring which Congress may tap as the need arises. The donation of power is plenary; its utilization is determined by the donee. Nowhere is this more evident than in the Commerce Clause. In Caminetti v. United States, 242 U.S. 470, at page 491, 37 S.Ct. 192, at page 197, 61 L.Ed. 442, the Court said:

" * * * The act has its constitutional sanction in the power of Congress over interstate commerce. The broad character of that authority was declared once for all in the judgment pronounced by this court, speaking by Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. 1 [6 L.Ed. 23], and has since been steadily adhered to and applied to a variety of new conditions as they have arisen. * * * "

Congress, in § 1952, has decided that the facilities of interstate commerce become tainted when they are used by persons with evil motives and who perform evil acts. This is a legislative determination, the wisdom of which we could not question if we would and would not if we could. In Hoke v. United States, 227 U.S. 308, at page 322, 33 S.Ct. 281, at page 284, 57 L.Ed. 523 (1913), speaking of the Mann Act, the Court said:

" * * * This is the aim of the law expressed in broad generalization; and motives are made of determining consequence. Motives executed by actions may make it the concern of Government to exert its powers. Right purpose and fair trading need no restrictive regulation, but let them be transgressed and penalties and prohibitions must be applied. * * * "

The motion to dismiss will be denied.

## II.

### THE MOTION TO SUPPRESS

At about one o'clock on the morning of January 20, 1962, some 50 federal agents raided premises 235–237 Cherry Street, Reading, Penna. The initial entry was purportedly for the purpose of executing 10 arrest warrants. Defendants contend that the entry of the F.B.I. was improper, in that no proper announcement of identity and purpose was made before breaking down a door of the

property through which the agents entered and that, hence, the property thereafter seized was taken illegally.

 The facts as developed at the hearing indicate that the lead agents entered the front door of the property, which was unlocked. They then passed through a second door which was released from the inside by a buzzer in response to the F.B.I.'s buzz. They came then upon a third door which had no handle but which had a one-way glass through which the F.B.I. men could not see. The two agents in the lead testified that they announced their identity to the closed door in a tone of voice loud enough so that anyone on the other side would have heard that announcement. Thereupon, and without any indication in the record of any time lapse after the announcement, Agents Dean and Bass proceeded to break out the glass and knock away from the inside of the door certain boards which held it shut. Both testified that no announcement of purpose was made until Agent Frohbose entered through the broken door and into the room. There was testimony from Agent Pearce that prior to the breaking of the third door Agent Frohbose did announce the purpose of the F.B.I.'s visit. In view of the conflict between the testimony of the agents we must choose between the differing stories.

We cannot escape the conclusion that Agent Pearce was mistaken in his recollection of the events. As among the four leading agents, Pearce was last and farthest removed from the third door. Ahead of him, and between him and the door, were Agents Bass and Dean and Special Agent in Charge Frohbose. Undoubtedly, Bass and Dean were in the best position to observe what happened before the door was broken down. From their testimony it is unmistakable that no announcement of purpose was made until after the third door was broken down and Agent Frohbose had entered the room. We think it of extreme significance that government counsel, an able trial lawyer and one more experienced than most in the criminal field, although

permitted to cross-examine and to lead the government agents who testified, made no attempt to elicit from either Dean or Bass an announcement of purpose before the door was broken down. Pearce, we think, was undoubtedly mistaken as to when the announcement of purpose was made because of the swiftness of events, his position at the rear and the general confusion.

We therefore find as a fact that the agents on approaching the third door announced that they were the F.B.I. and then immediately broke down the door and entered. It was after the breaking and entry that Agent Frohbose announced that their purpose was to arrest certain persons present for whom the F.B.I. had warrants.

We must interpret the thrust of Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), for that case is the keystone of defendants' argument that the arrest warrants were unlawfully executed. Miller was convicted in the District of Columbia partly on the basis of marked money which he claimed was seized pursuant to an unlawful arrest. On the morning of the arrest, one Reed had been arrested on a warrant on suspicion of narcotics. Reed revealed to a government agent, Wilson, that he purchased heroin from Miller through one Shepherd. Later, Lewis, another agent, went with Reed to Shepherd's home, met Shepherd and delivered to Shepherd $100 in marked bills. Shepherd agreed to secure 100 capsules of heroin from Miller and deliver them to Lewis. Shepherd was followed to Miller's apartment building, was seen to enter and then to leave. He was later arrested and discovered to have 100 capsules of heroin, but not the marked bills. The federal officers, accompanied by Wurms, an officer of the District of Columbia police, returned to Miller's apartment. Wurms knocked, and upon inquiry from within—"Who's there?"—replied in a low voice, "Police". Miller opened the door on an attached door chain and asked what the officers were doing there. Before either could reply, he attempted to

close the door and fled toward the rear of the apartment. Thereupon, the officers reached in, pulled the chain off, entered and in due course found the marked money. They had no arrest or search warrant.[8] The Supreme Court reversed the conviction holding that because there had been no announcement by the officers of their *purpose*, even though *identity* had been announced, the breaking of the door was illegal, the arrest was unlawful, the consequent seizure of the marked bills was equally unlawful and that the bills were therefore improperly admitted into evidence. Justice Brennan said, at page 308, 78 S.Ct. at page 1195:

"* * * Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, the breaking was unlawful where the officer failed first to state his authority *and purpose* for demanding admission. * * *" (Emphasis added.)

Here, as in Miller, there was no announcement of purpose before the forcible entry. It follows ineluctably that if the law of Miller applies here, and if there are no perimeter facts which would justify an exception to that rule, the evidence seized here must be suppressed.

The government seeks to avoid the impact of Miller on several grounds:

1. The legality of an arrest is to be determined by the law of the state in which the federal court sits. Since Miller arose from the District of Columbia, it is merely the statement of a local District rule of law, not applicable here.

2. Assuming that the law of Miller applies, there are factual exceptions to its demands and such facts are present here in that (a) the agents had reasonable cause to believe that defendants were virtually certain of the agents' purpose and an announcement of purpose would have been a futile gesture; (b) that no announcement is necessary when the of-

ficers in good faith believe that they or someone within are in peril of bodily harm.

As to the government's first point:

It is impossible to read Miller as narrowly as the government would have us do. An analysis of the entire opinion leaves no doubt in our mind that the Court was expounding a guiding rule of federal law; otherwise, we think, the decision would not have been reviewed.

In Del Vecchio et al. v. Bowers, 296 U.S. 280, at page 285, 56 S.Ct. 190, at page 192, 80 L.Ed. 229 (1935), the Court said:

"* * * We will not ordinarily review decisions of the United States Court of Appeals, which are based upon statutes so limited or *which declare the common law of the District.* * * *" (Emphasis added.)

And in Miller the Court made it clear that it was reversing because of the close relationship of the District rule[9] to a statute of the United States, 18 U.S.C.A. § 3109. That section provides:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

The Miller Court said (357 U.S. at page 306, 78 S.Ct. at page 1194):

"* * * But the Government agrees with petitioner that the validity of the entry to execute the arrest without warrant must be tested by criteria identical with those embodied in 18 U.S.C. § 3109, which deals with entry to execute a search warrant. That section provides that an officer, executing a search warrant, may break open a door only if, 'after

---

8. However, under District of Columbia law, Officer Wurms had authority to arrest on reasonable cause to believe a felony was being committed.

9. Accarino v. United States, 85 U.S.App. D.C. 394, 179 F.2d 456 (1949).

notice of his authority and purpose,' he is denied admittance. The Government states in its brief that, 'where an arrest is made on probable cause rather than a warrant, these statutory requirements must be met before an officer can force entry into an apartment.' These statutory requirements are substantially identical to those judicially developed by the Court of Appeals for the District of Columbia Circuit in Accarino v. United States, 85 U.S.App.D.C. 394, 403, 179 F.2d 456, 465. *Since the rule of Accarino bears such a close relationship to a statute which is not confined in operation to the District of Columbia,* we believe that review is warranted here. * * *"

■ Plainly stated, the Court had to decide not the application of a local rule as such, but whether or not the criteria of § 3109 had been met because the local rule of law was so closely related to that statute of national application. This necessarily involved a construction of § 3109, with the implicit recognition that where property has been seized pursuant to arrest, rather than under authority of a search warrant, the criteria are no different. We have, therefore, an opinion by the Supreme Court which interprets the requirements and effect of a federal statute in the precise context of the present case.

■ In the light of this conclusion there is no room for doubt that, unless there are exceptions to the rule and, if so, unless this case falls within them, the evidence must be suppressed. Clearly, both common law [10] and § 3109 require that arresting officers, before breaking open doors, announce both their identity and purpose.

The Court said in Miller, 357 U.S. at pages 308–310, 78 S.Ct. at pages 1195–1196:

" * * * The requirement was pronounced in 1603 in Semayne's Case,

5 Co.Rep. 91, 11 E.R.C. 629, 77 Eng. Repr. 194, at 195: 'In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. *But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors * * *.'* (Emphasis the Court's).

"The requirement stated in Semayne's Case still obtains. It is reflected in 18 U.S.C. § 3109, in the statutes of a large number of States, and in the American Law Institute's proposed Code of Criminal Procedure, § 28. * * *

"The rule seems to require notice in the form of an express announcement by the officers of their purpose for demanding admission. The burden of making an express announcement is certainly slight. A few more words by the officers would have satisfied the requirement in this case. * * *"

■ This language needs no embroidery. Since there was here no announcement of purpose, the breaking, arrest and subsequent search were *prima facie* illegal. But, says the government, there are exceptions to the requirement of § 3109. Whether exceptions do, in fact, exist is by no means free of doubt. The Court in Miller, 357 U.S. at page 309, 78 S.Ct. at page 1196, said:

" * * * But whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances is not a question we are called upon to decide in this case. * * *"

However, the Court also said, at page 310, 78 S.Ct. at page 1196:

" * * * It may be that, without an express announcement of purpose, the facts known to officers would jus-

---

10. Thus, there being no appropriate Pennsylvania decisions, even if we look to common law, as the government urges, we come out at the same place.

tify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture. * * * "

The government argues that this is the case here and therefore no announcement was required. There are several rather obvious flaws in the government's position.

In the first place, there is no showing of any facts known to the officers that would justify them in being virtually certain that those inside the room even knew of their presence for the agents addressed a closed solid door. It seems almost unnecessary to spell out the sequential corollary: if the agents had nothing that would justify a virtual certainty of knowledge of their presence (and so, of their identity), it is logically impossible for such a certainty of knowledge of purpose to exist.

█ Secondly, even if we assume that those inside knew of the presence of the F.B.I. this knowledge of identity does not carry with it knowledge of purpose. They may have been there for a variety of reasons and it is the design of the rule that the officers indicate for which one of many possible reasons they demand admittance. Again, in Miller the defendant looked out, saw and actually knew the officers involved but the statement of purpose was not excused. Were the rule otherwise the requirement of announcement of purpose would be a complete superfluity, for it would follow that whenever a law officer knocked and identified himself that very identification would demonstrate within itself the reason for his presence. This is neither the fact nor the law.

█ Finally, the only justification for breaking doors is the refusal of the occupant to open on demand. In 1 Hale, Pleas of the Crown, 583 (1736), it is said:

"A man, that arrests upon suspicion of felony, may break open doors, if the party refuse upon demand to open them . . . "

Thus, underlying the asserted relief from the necessity of announcing purpose is the assumption that there has been an announcement of identity together with virtual certainty of knowledge by the defendants of the officers' purpose and that *thereafter admittance is refused*. Unfortunately for the government's case, even if we assume a knowledge of purpose there was not even an opportunity for much less actual refusal of admittance. The F.B.I.'s breaking open the door immediately after the announcement of identity effectively precluded either. We need not determine the precise interval that must elapse between announcement and breaking which would justify the conclusion that opportunity had been offered and rejected, for this varies with the circumstances: United States v. Gorman, 208 F.Supp. 747, (E.D.Mich., S.D.1962). Suffice it to say that where, as here, there was no opportunity, it cannot be said that admittance was refused.

The government's final excuse for the failure of the agents to announce purpose is that the officers in good faith believed that they would be placed in peril were the announcement made. We may consider this argument from two standpoints: (1) the evidence on which the asserted belief was based; and (2) the evidence of the agents' own action.

█ As to the former, the evidence was totally unconvincing. The agents had information, never confirmed, that there might be a single armed guard in the premises as against at least 50 F.B.I. agents, all armed, some with shotguns. There was also offered vague generalities about the criminal records of some of the persons on the premises. Only two of these were identified. One of them, not a defendant, had been convicted of crap-shooting. The F.B.I. agent conceded this was not a crime of violence. The other was defendant Barrow, who, in 1933, had been held in $1500 bail on "suspicion of murder", disposition unknown. This evidence is not calculated to raise a reasonable belief of peril.

Secondly, there was in fact an announcement of identity. Obviously, if the agents had a bona fide belief that announcement would result in peril, that peril would come from the fact and not the nature of an announcement. The fact that some announcement was made dispels any doubt that the agents had no bona fide apprehension of peril if an announcement were made.

From what we have said, it follows that the entry to execute the arrest warrants was illegal. The property, therefore, cannot be said to have been seized lawfully in connection with a lawful arrest.

Following the entry Agent Westphal entered the premises, looked around the room and into a small backroom and then returned to a car outside where the United States Commissioner was waiting with a previously prepared search warrant and affidavit. Westphal signed and executed the affidavit which was based on his personal observations and the search warrant was issued. Westphal then returned to the premises, the word was passed among the agents that there was a warrant outstanding and they proceeded to make a thorough search of the property. In the meantime, the agents had the property and all the some one hundred occupants under control.

The illegality of a seizure is not cured by the subsequent issuance of a search warrant supported by an affidavit based upon information obtained through an original illegal entry.

"* * * A federal agent cannot participate in an unlawful search, and then on the basis of what he observed in the course of that search, and on that basis alone, go to a United States Commissioner and swear out a search warrant. Such a search warrant, and the evidence procured in the course of a search thereunder, would be merely the illegal product of a previous unlawful search by the federal authorities. * * *" McGinnis v. United States, 227 F.2d 598, 603 (C.A.1, 1955).

The original entry here was illegal. The information acquired through that entry was illegally acquired. The search warrant, therefore, adds nothing of legality to the original illegal seizure. The motion to suppress will be granted.