Joseph **HENDRICKS**, Appellant,

v.

Harold R. **SWENSON**, Warden, Appellee.

No. 71–1455.

United States Court of Appeals,
Eighth Circuit.

March 1, 1972.

Rehearing and Rehearing En Banc
Denied March 30, 1972.

Heaney, Circuit Judge, dissented
and filed opinion.

**504**

Joseph Hendricks, on brief pro se.

John C. Danforth, Atty. Gen., and Kenneth M. Romines, Asst. Atty. Gen., Jefferson City, Mo., on brief for appellee.

Before GIBSON and HEANEY, Circuit Judges and VAN PELT, Senior District Judge.

VAN PELT, Senior District Judge.

Appellant Joseph Hendricks appeals from a denial of his petition for writ of habeas corpus. The district court, in an unreported opinion of Judge Wangelin, denied the writ without a hearing.

Appellant was convicted of first degree murder by a jury in the Circuit Court of St. Louis County, Missouri. He was sentenced to life imprisonment on September 12, 1969. He appealed to the Missouri Supreme Court, which affirmed the conviction and sentence. State v. Hendricks, 456 S.W.2d 11 (Mo. 1970).

The claims on appeal are: (1) that the State failed to establish beyond a reasonable doubt an essential element of the crime charged, to-wit, that the defendant made an assault on one Francis Krewit on October 22, 1968, and (2) that the trial court erred in denying defendant's motion to suppress all statements made by the defendant to certain police officers, including tape recordings taken in the prosecuting attorney's office, on the grounds these statements were obtained by means of mental and physical coercion. These same claims were directly ruled upon by the Missouri Supreme Court and thus the appellant has effectively exhausted his state remedies. Irvin v. Dowd, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 (1959); Losieau v. Sigler, 421 F.2d 825 (8th Cir.

1970); Capler v. Greenville, 422 F.2d 299 (5th Cir. 1970). We affirm.

Hendricks' first claim is that the State failed to establish beyond a reasonable doubt the element of the crime above mentioned. He admits that he robbed and assaulted the decedent on October 12, 1968. He denies he made, or took part in, any assault on October 22, 1968. Decedent was admitted to the hospital October 24th and died on October 26, 1968.

Habeas corpus will not lie to question the sufficiency of the evidence supporting a conviction unless there is such an absence of evidence that the conviction violates the due process clause of the Fourteenth Amendment. Freeman v. Stone, 444 F.2d 113 (9th Cir. 1971); Young v. Alabama, 443 F.2d 854 (5th Cir. 1971); Holloway v. Cox, 437 F.2d 412 (4th Cir. 1971); Johnson v. Turner, 429 F.2d 1152 (10th Cir. 1970). This court has carefully examined the transcript of the evidence at the trial. Statements made by the defendant and corroborated by police officers, when considered with the testimony of a neighbor of decedent, who testified that he saw Hendricks coming from decedent's house across a gangway into witness's yard at approximately 1:30 o'clock A.M. on October 22, 1968, support the State's claim that Hendricks made the assault in the early morning hours of October 22, 1968. We cannot say that the conviction was so devoid of evidentiary support as to raise a due process issue.

Appellant next claims that the trial court should have suppressed certain statements made to the police and the video tape recording of those statements which was shown to the jury. It is the appellant's contention that the statements were obtained by means of mental and physical coercion. An examination of the transcript of the hearing on appellant's motion to suppress supports the conclusion that the statements given by appellant were freely and voluntarily given, with full and complete

knowledge of the consequences. The police officers testified that they fully advised appellant of his constitutional rights; that he was allowed to make a phone call; that he stated he did not want to have a lawyer present; and that absolutely no force was used in obtaining appellant's statements or confession.

The issue the dissent raises as to appellant's mental capacity requires brief comment. This has not been passed on by any other judge except as it was involved in the hearing on the motion to suppress evidence.

Mr. Hendricks testified in that hearing as to special classes in three schools but that at St. Francis Xavier School he was not in a special class (T.p.29). His sister, Mrs. Guiot, who testified at the murder trial, was not questioned about the matter and Mr. Hendricks' counsel did not question him about it at the trial. Hendricks appears here *pro se.*

■ Finding that the statements were given voluntarily, the use of the video tape did not impinge appellant's constitutional rights. The officers testified that they advised appellant that a video tape would be used; that it could be used against him in court; and that it would record his picture as well as his voice. In addition, the video tape operator explained the video tape recorder to the appellant before taking his statement. Thus appellant was aware of the use of the video tape, and its effect.

Such use of a video tape is supported by recent changes in the Federal Rules of Civil Procedure which, under Rule 15(a) of the Federal Rules of Criminal Procedure, become applicable in criminal cases.

The Federal Rules of Civil Procedure provide for the taking of depositions by other than stenographic means and presuppose their use in court. *See* Carson v. Burlington Northern, Inc., 52 F.R.D. 492 (D.Neb.1971). No valid distinction exists between the use of a deposition taken by video tape and the use of a statement taken by video tape. The Congress, in adopting the Organized Crime Control Act in October, 1970, recognized Rule 15, *supra,* and again provided for taking depositions in criminal cases in the manner provided in civil actions. *See* 18 U.S.C.A. § 3503(d).

■ There are other reasons for our holding. It is elementary that a person in lawful custody may be required to submit to photographing, Smith v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), and authenticated photographs of the defendant are admissible at trial to identify him. United States v. Parhms, 424 F.2d 152 (9th Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 92, 27 L.Ed.2d 83 (1970); United States v. Hobbs, 403 F.2d 977 (6th Cir. 1968); United States v. Amorosa, 167 F.2d 596 (3d Cir. 1948).

The Model Code of Evidence, issued by the American Law Institute's Committee on Evidence in 1942, proposed in the comment to Rule 105(j) the use of a "talking motion picture machine" upon verification that the record "has produced and will produce accurately a confession of defendant."

In so doing, the American Law Institute was not only approving the position expressed by the text writers but also the law as announced in the few reported cases up to that time. *See* Commonwealth v. Roller, 100 Pa.Super. 125 (1930) (sound and motion picture film of defendant's confession to a burglary charge held admissible); People v. Hayes, 21 Cal.App.2d 320, 71 P.2d 321 (1937) (manslaughter; sound motion picture of the defendant making a confession to police officers was admitted). Since then other cases have so held. People v. Dabb, 32 Cal.2d 491, 197 P.2d 1 (1948) (court admitted into evidence a sound motion picture showing defendants reenacting the crime and admitting that they had committed the crime in the manner depicted); Paramore v. State, 229 So.2d 855 (Fla.1969) (video

tape of defendant's confession admitted into evidence); Grant v. State, 171 So. 2d 361 (Fla.1965), cert. denied, 384 U.S. 1014, 86 S.Ct. 1933, 16 L.Ed.2d 1035 (1966) (color motion picture portraying a voluntary reenactment of the crime by defendant held admissible); Jones v. State, 151 Tex.Crim. 519, 209 S.W.2d 613 (1948) (motion picture of defendant charged with bribery held admissible). *See also* United States v. Moran, 194 F. 2d 623 (2d Cir.), cert. denied, 343 U.S. 965, 72 S.Ct. 1058, 96 L.Ed. 1362 (1952) (motion picture without sound was admitted to show defendant's demeanor while testifying before a Senate subcommittee, the charge being that defendant had committed perjury before that subcommittee).

Several courts have also upheld the use of motion pictures showing a defendant's demeanor or condition following his arrest for driving under the influence of alcohol. *See, e. g.*, State v. Strictland, 276 N.C. 253, 173 S.E.2d 129 (1970); Lanford v. People, 159 Colo. 36, 409 P.2d 829 (1966); Housewright v. State, 154 Tex.Crim. 101, 225 S.W.2d 417 (1949). *See also* Comment, Use of Videotape in the Courtroom and the Statehouse, 20 DePaul L.Rev. 924 (1971); and the note in 62 A.L.R.2d 686.

Differing with our colleague, we suggest that a video tape is protection for the accused. If he is hesitant, uncertain, or faltering, such facts will appear. If he has been worn out by interrogation, physically abused, or in other respects is acting involuntarily, the tape will corroborate him in ways a typewritten statement would not. Instead of denying a defendant his rights, we believe it is a modern technique to protect a defendant's rights.

We do not agree with our colleague as to the need for make-up and other preparation to project a better image. To permit the applying of make-up would defeat the true purpose of a statement which is to present the facts as they are. It would place in the hands of any person willing to alter evidence the opportunity to eliminate cuts, bruises, or other signs, if any, of mistreatment.

■ If a proper foundation is laid for the admission of a video tape by showing that it truly and correctly depicted the events and persons shown, and that it accurately reproduced the defendant's confession, we feel that it is an advancement in the field of criminal procedure and a protection of defendant's rights. We suggest that to the extent possible, all statements of defendants should be so preserved.

The dissent attempts to lump the video taping of a confession with all forms of visual aids or entertainment, such as television or movies. However, the video tape in question here is *not* a television broadcast or movie designed to entertain or manipulate an audience. It is *not* merely a "packaging device for consumers," as stated by Marshall McLuhan in referring to the press, movies, and radio. McLuhan, in his book quoted in the dissent, is talking about the electronic media's vast impact on today's audiences and of the vast opportunities to educate those audiences by means of the media.

This does not mean that the principles to be employed in making it a more effective device for education defeat its use to correctly detail a voluntary confession.

The dissent also indirectly calls attention to the television experiences of a certain Presidential candidate. We do not see a trial as a stage appearance or as a campaign presentation. We believe it a part of the procedure for obtaining justice, and emphasize the importance of a trial truly presenting the facts as they exist. We believe that this is best done whether video tape is used or whether the witnesses testify in court by presenting the events and the parties as they are.

■ As to whether the use of such tape comes dangerously close to requiring the defendant to incriminate himself, we think this no more incriminates him than the taking of still pictures or

blood or urine samples. Such procedure does not violate the Fifth Amendment. Schmerber v. California, 384 U.S. 757, 760–65, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); United States v. Kee Ming Hsu, 424 F.2d 1286, 1290 (3d Cir. 1970), cert. denied 402 U.S. 982, 91 S.Ct. 1643, 29 L. Ed.2d 148 (1971); United States v. Amorosa, *supra*. We conclude that a video tape incriminates the defendant only if the statement itself is incriminating. If the proper foundation has been laid, the reception in evidence of a video tape should aid the trier of fact.

It has been said "Evidence is produced so that the impartial trier of fact can decide how an event occurred. Time is irreversible, events unique, and any reconstruction of the past at best an approximation." Cases and Materials on Evidence, 5th Ed. P. 1 by Weinstein, et al.

We must recognize that the capacity of persons to observe, remember and relate varies as does their ability and desire to relate truly. For jurors to see as well as hear the events surrounding an alleged confession or incriminating statement is a forward step in the search for the truth. And after all, the end for which we strive in all trials is "that the truth may be ascertained and the proceedings justly determined." We conclude that the denial of the writ of habeas corpus to Mr. Hendricks was a just determination, and we affirm the trial court.

HEANEY, Circuit Judge (dissenting).

I respectfully dissent.

The defendant was below average in intelligence.[1] He did not fully understand the questions put to him, and he expressed himself poorly.[2] Furthermore, when the defendant was first informed of his rights, he stated that he did not want to make any statement.[3] In light of these facts, the defendant should not have been questioned further. The Supreme Court said in Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966):

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. ⁑ ⁑ ⁑ "

See, George, a New Look at Confessions, 196. Under *Miranda,* I would rule out both the oral and videotaped statements.

Even if the circumstances were such that Hendricks' oral statement was admissible, the videotaped statement should not have been admitted because:

(1) it was not a faithful reproduction of the entire interrogation but was, rather, a staged production of the confession alone;

(2) there was no showing that Hendricks fully understood the implications

---

1. The defendant's sister testified that when he was in the third or fourth grade, he was tested in school and, as a result of the tests, was put in a room for "special" children. From that time until he finished his education, the defendant was in special classes. At the end of his education, he was in a special school altogether. Hendricks' sister further stated that she did not believe he got through the sixth grade, although she was uncertain because they did not grade him like they do regular children.

2. There were instances in which the defendant used improper variations of words, indicating poor grammatical ability. In general, he used a childlike vocabulary.

3. The defendant testified that when he was first brought to the police station at 11:00 a. m., an officer read a paper to him that said " ⁑ ⁑ ⁑ something like you can have a lawyer, be silenced, stuff like that. I told him I wanted to be silenced. ⁑ ⁑ ⁑ ". The police officer also testified that Hendricks told him that he did not want to make any statement. Hendricks was then put in a cell until 6:00 in the evening, at which time he was brought out again and advised of his rights. After interrogation, he made the oral statement.

of the use of his videotaped statement at trial.

Rule 15, Fed.R.Civ.P., and the cases permitting the use of videotape for the taking of depositions which are later introduced at trial, are not entitled to weight in determining if a videotaped confession should be admitted because of the great differences between the circumstances involved. In a deposition, there is no question of the voluntariness of the procedure; the entire procedure, not just a part, is videotaped; and the witness is represented by counsel who, presumably, is aware of the problems involved in having his client deposed on videotape. None of these circumstances is present when a confession is videotaped.

The cases holding that videotaped confessions are admissible failed to sufficiently analyze the problems presented.

First, they assume that a videotaped confession will faithfully reproduce the transaction between the defendant and the police. In fact, only the end product, the confession itself, is videotaped.

Second, they assume that the videotape will show the defendant as he truly is, and that the defendant's true qualities will be captured on the videotape. In fact, the videotape will tend to make the defendant look "rougher" than he is in the flesh. The videotape camera will emphasize scars, blemishes, or a heavy beard, and it may create shadows under the eyes or elsewhere on the face. See, Zettl, Television Production Handbook (2nd Ed. 1968), at 369–372. The videotape camera will pick out and magnify unpleasant mannerisms. *Id.* at 342. These lessons have been learned by candidates for public office to their sorrow. See, *e. g.*, McGinniss, The Selling of the President 1968 (1969). In order to present even a normal appearance on videotape, most persons must be made up and otherwise prepared. Zettl, Television Production Handbook, *supra* at 369–387.

Third, these cases assume that a videotaped confession is the qualitative equivalent of a written statement instead of a totally different form of communication which requires different sensory responses from those demanded by writing. A videotaped confession has a much more powerful emotional effect than a written one. Because videotaped images are fleeting and their impact is immediate, they cannot be easily evaluated or analyzed. A written statement, on the other hand, is comparatively bland. It involves only one of the senses. The reader can go back, criticize, and analyze as he goes along.

Marshall McLuhan has pointed out the differences between television and writing in his book, The Medium is the Massage. He states there:

"In television there occurs an extension of the sense of active, exploratory touch which involves all the senses simultaneously, rather than that of sight alone. You have to be 'with' it. But in all electric phenomena, the visual is only one component in a complex interplay. Since, in the age of information, most transactions are managed electrically, the electric technology has meant for Western man a considerable drop in the visual component, in his experience, and a corresponding increase in the activity of his other senses.

"Television demands participation and involvement in depth of the whole being. It will not work as a background. It engages you. Perhaps this is why so many people feel that their identity has been threatened.
\* \* \*

" \* \* \* In television, images are projected at you. You are the screen. The images wrap around you. You are the vanishing point. This creates a sort of inwardness, a sort of reverse perspective which has much in common with Oriental Art.
\* \* \* \* \* \*

"The main cause for disappointment in and for criticism of television is the failure on the part of its critics to view it as a totally new technology

which demands different sensory responses. These critics insist on regarding television as merely a degraded form of print technology. * * * " McLuhan, The Medium is the Massage (1967), at 125–128.

Because of this strong appeal to the senses and the quality of "liveness" in a videotaped confession, I believe that the use of such a confession comes dangerously close to requiring the defendant to incriminate himself. In terms of effect upon the jury, the playing of a defendant's videotaped confession at trial is the functional equivalent of requiring him to take the stand and testify against himself.

Fourth, these cases assume that the defendant has sufficient knowledge of the television medium to enable him to make a knowing waiver of his rights. In fact, he probably has never seen himself on television. He has no way of evaluating how he will look and what the impact of his appearance, demeanor, and mannerisms will be. Unfortunately, the impact will probably be negative and prejudicial for the reasons stated above. In sharp contrast, a defendant knows, from common experience, what a written statement looks like; he knows what its visual and emotional impacts are. Thus, he is able to evaluate how much a written statement will damage him in the eyes of the jury.

While I am not now prepared to hold that videotaped confessions are never admissible, I believe they should be excluded unless the following minimal standards are met:

(1) the entire transaction between the police and the defendant, from the time he is booked until he makes his statement, including all interrogations, should be videotaped;

(2) the defendant should be given the Miranda warnings at the time he is booked; he should be thoroughly advised regarding the use to be made of the videotape; and all of these warnings should be videotaped;

(3) the defendant should be given a copy of the videotape for his retention until such time as he has exhausted his appellate remedies.

I can perceive no reason why these restrictions should be prohibited by cost, impracticability, or lack of technological advancement. See, Zettl, Television Production Handbook, *supra* at 319–340.