UNITED STATES, Appellee

v

SHELDEN G. HOOPER, Rear Admiral (Retired)
U. S. Navy, Appellant

9 USCMA 637, 26 CMR 417

No. 11,113

Decided September 26, 1958

*Commander Charles Timblin* argued the cause for Appellant, Accused.

*Commander Louis L. Milano* argued the cause for Appellee, United States. With him on the brief was *Commander Craig McKee.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted by general court-martial of violations of Articles 125, 133 and 134, Uniform Code of Military Justice, 10 USC §§ 925, 933, 934, and was sentenced to dismissal and total forfeitures. The case is before this Court for mandatory review in accordance with Article 67(b) (1), Uniform Code, supra, 10 USC § 867.

At the outset of this review we are met, as were the tribunals below, with a defense claim that the court-martial had no jurisdiction over the accused. The factual basis for this position is undisputed.

On December 1, 1948, upon Presidential approval, the accused was transferred to the Regular Navy retired list with the rank of Rear Admiral but with retired pay based on the rank of Captain, in accordance with the provisions of Title 34 USC §§ 410b and 410n.[1] While in this status, the offenses oc-

---

[1] § 410b. "When any officer of the Regular Navy or the Regular Marine Corps or the Reserve Components thereof, including any member of the naval service temporarily appointed to commissioned grade whose permanent status is enlisted, has completed more than twenty years of active service in the Navy, Marine Corps, Army, Air Force, or Coast Guard, or the Reserve Components thereof, including active duty for training, at least ten years of which shall have been active commissioned service, he may at any time thereafter, upon his own application, in the discretion of the President, be placed upon the retired list on the first day of such month as the President may designate.

curred, and the charges were preferred against him. He was informed of said charges April 15, 1957, by the Acting Commandant, 11th Naval District. After full investigation was held, as required by Article 32, Uniform Code, supra, 10 USC § 832, the Commandant, 11th Naval District, referred the charges for trial to a general court-martial convened at his direction. Thereafter, a copy of the charges was served upon the accused. No pretrial restraint was imposed. On May 6, 1957, the date set for trial, the accused, together with civilian counsel of his own selection, and appointed military counsel, appeared before the court-martial. Upon arraignment, counsel interposed his challenge to the jurisdiction of the forum, but his contentions were denied. Rather than enter his pleas, the accused, as was his right, stood mute, so a plea of not guilty was entered as to each charge and specification.

The trial court relied upon Article 2 of the Uniform Code, supra, 10 USC § 802, as its source of jurisdiction. This provides, in pertinent part:

"The following persons are subject to this chapter:

. . . . .

(4) Retired members of a regular component of the armed forces who are entitled to pay; . . ."

Neither by its express terms nor by any related provision of the Code, or other Congressional enactment, are any limitations or conditions put upon the exercise of the jurisdiction thus conferred. Hence, if this section is not contrary to the Constitution, it authorizes the proceedings in this case.

The defense argues, however, that jurisdiction over retired naval officers, such as the accused, cannot attach in the absence of an order effecting their return to active duty; that if the order directing trial is considered an order to active duty, it conflicts with 10 USC § 6481,[2] for it was not issued by the Secretary of the Navy, in time of war

As used in this section 'active commissioned service' includes all active service performed under a temporary appointment to a commissioned grade, including a commissioned warrant grade, by an officer whose permanent status is enlisted."

§ 410n. "All officers of the Navy, Marine Corps, and the Reserve Components thereof, who have been specially commended for their performance of duty in actual combat by the head of the executive department under whose jurisdiction such duty was performed, when retired, except officers on a promotion list who may be retired for physical disability, shall, upon retirement, be placed upon the retired list with the rank of the next higher grade than that in which serving at the time of retirement and the grade in which serving at the time of retirement shall be construed to mean the highest grade in which so serving whether by virtue of permanent or temporary appointment therein: Provided, That all officers heretofore and hereafter holding rank or grade on the retired list above that of captain in the Navy or colonel in the Marine Corps solely by virtue of such commendation, if hereafter recalled to active duty, may, in the discretion of the Secretary of the Navy, be so re-

called either in the rank or grade to which they would otherwise be entitled had they not been accorded higher rank or grade by virtue of such commendation, or in the rank or grade held by them on the retired list: Provided further, That the provisions of this subsection shall not apply in the case of any officer who has been so commended if the act or service justifying the commendation was performed after December 31, 1946: Provided further, That nothing in this subsection shall be construed to increase the retired pay of officers heretofore or hereafter placed upon the honorary retired list for the Naval Reserve: Provided further, That officers of the classes described in this subsection who have been retired prior to August 7, 1947, shall be entitled to the benefits of this subsection from August 7, 1947: And provided further, That nothing in this subsection shall be held to reduce the retired rank or pay to which an officer would be entitled under other provision of law."

[2] 10 USC § 6481. "In time of war or national emergency declared by the President, the Secretary of the Navy may order any retired officer of the Regular Navy or the Regular Marine Corps to active duty at sea or on shore. At any other time the Secretary may

640

or national emergency declared by the President, nor with the consent of the officer concerned.

We cannot, consistently with well-established rules of statutory construction, accept this view. Engrafting such a requirement upon Article 2(4) would nullify its provisions completely. Article 2(1) makes all persons on active duty subject to the Code in the following language:

"The following persons are subject to this chapter:

(1) Members of a regular component of the armed forces, including those awaiting discharge after expiration of their terms of enlistment; volunteers from the time of their muster or acceptance into the armed forces; inductees from the time of their actual induction into the armed forces; and other persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates they are required by the terms of the call or order to obey it."

An officer recalled to duty from the retired list of a regular component is subject to the Code by virtue of this provision alone. It necessarily follows from this that if Article 2(4) requires the individual be recalled as a condition precedent to its effectiveness, its provisions are entirely unnecessary and could never be operative.

In this particular, 50 Am Jur, Statutes, § 359, notes:

"It should not be presumed that any provision of a statute is redundant. To the contrary, it is to be presumed that one paragraph or word of a statute is not a needless repetition of another, and courts should hesitate in ascribing careless and needless tautology to the lawmaking body. Hence a construction will be avoided which would render a part of a statute superfluous, or which would give to a particular word or phrase the same meaning as the word or phrase preceding it, so that the latter adds nothing to the statute."

See also United States v Bledsoe, 152 F Supp 343 (WD Wash) (1956).

The *Bledsoe* case, supra, relied on by the defense as an additional authority for its position that jurisdiction did not lawfully attach, is inapposite. There, retired enlisted men were recalled to active duty solely for the purpose of appearing before a court-martial for trial upon charges arising out of their activities while in a retired status. The suit was instituted to release the accused from their physical restraint and did not pass on the question of the jurisdiction of the naval service to try them under the Article here involved. The court held that a call to active duty for that single purpose was contrary to the statute relied upon.[3] Upon appeal, this conclusion was affirmed by the United States Court of Appeals for the Ninth Circuit. 245 F 2d 955 (1957). Although the result reached by the Circuit Court of Appeals, Second Circuit, in United State v Fenno, 167 F 2d 593 (1948), in a substantially similar case, is apparently contrary to that expressed in the *Bledsoe* opinion, we are not called upon to decide the question, for in this case, the accused was neither restrained nor recalled to duty. He appeared in person before a general court-martial, the processes of which were begun by charges duly preferred and served upon him. If the accused is personally subject to court-martial jurisdiction under the Constitution and the Uniform Code, these successive steps were sufficient for jurisdiction to attach and authorize the court-martial to proceed to trial. Bar-

order such a retired officer to active dut at sea or on shore only with his consent."

 [3] "The Secretary of the Navy is authorized in time of war, or when a national emergency exists, to call any enlisted man on the retired list into active service for such duty as he may be able to perform. While so employed such enlisted men shall receive the pay and allowances authorized by section 26 of Title 37, except as otherwise provided in the next section." 34 USC § 433 (March 3, 1915, c. 83, 38 Stat 941; August 29, 1916, c. 417, 39 Stat 591).

**641**

rett v Hopkins, 7 Fed 312 (CC D Kan) (1881); In re Walker, 3 Am Jurist 281; In re Carver, 103 Fed 624 (CC D Maine) (1900); United States v Reaves, 126 Fed 127 (CA 5th Cir) (1903).

In Closson v Armes, 7 App DC 460, Captain Armes, an officer on the retired list, sent an offensive letter to Lieutenant General Schofield, then commanding the Army of the United States and acting as Secretary of War. General Schofield ordered Armes' arrest and confinement upon charges arising therefrom. This order was carried out. The Court of Appeals for the District of Columbia upheld the arrest in an opinion in which, after alluding to the statutory basis for jurisdiction over the officer, it declared:

"The appellee, therefore, being an officer of the army, although on the retired list, and subject as such to trial by court-martial for violation of the articles of war, and the charges against him being for offences against those articles, such as have been stated, his arrest to answer those charges was right and proper. Actual arrest, or some equivalent of it, is an essential prerequisite under our system of criminal jurisprudence to the exercise of jurisdiction by any court having cognizance of criminal causes. It is an elementary principle in our law that no man is to be tried for crime in his absence. The arraignment of an accused person in court to hear the charge against him and to respond to it is essential to give validity to any proceeding thereon against him; and the only mode known to our law to secure the presence of such accused person for the purpose is by arrest. It is very true that an accused person may come in and voluntarily surrender himself; and that thereupon a court may proceed without the usual preliminary arrest. *But upon his surrender, he is in fact, and in contemplation of law, under arrest, and subject to detention.*" [Emphasis supplied.]

The final phase of the defense argument raises the applicability of the Fifth Amendment to the Constitution. He contends that if Article 2 (4) of the Code, supra, is considered without reference to other provisions, "it would seem to permit a military commander to snatch a retired regular off the streets and thrust him before a court-martial." Of course, this accused was not "snatched off the streets" nor was he "thrust before a court-martial." After due notice of the charges, he voluntarily appeared before the court-martial. Thus, there is found in this case none of the brutal and shocking circumstances suggested by the defense. If such circumstances ever operate to deprive a tribunal of its otherwise lawful authority, the accused here is in no position to avail himself of such a rule.

The Fifth Amendment to the Constitution provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, *except in cases arising in the land or naval forces,* or in the militia, when in actual service in time of war or public danger; . . . ." [Emphasis supplied.]

The sole problem left for resolution is whether or not the accused, as a retired member of a regular component of the Armed Forces entitled to receive pay, is a part of the "land or naval forces."

Courts which have heretofore expressed opinions on this question have concluded that retired personnel are a part of the land or naval forces. In arriving at this conclusion, each, with the exception of United States v Fenno, supra, appear to have assumed that being a part of such forces, court-martial jurisdiction necessarily attaches to them.

The Court of Claims has held retired personnel a part of the military force of this country. Tyler v United States, 16 Ct Cl 223; Runkle v United States, 19 Ct Cl 396; Franklin v United States, 29 Ct Cl 6. When the *Tyler* case, supra, was before the United

642

States Supreme Court, that tribunal, speaking through Mr. Justice Miller, declared:

"It is impossible to hold that men who are by statute declared to be a part of the army, who may wear its uniform, whose names shall be borne upon its register, who may be assigned by their superior officers to specified duties by detail as other officers are, *who are subject to the rules and articles of war, and may be tried, not by a jury, as other citizens are, but by a military court-martial, for any breach of those rules, and who may finally be dismissed on such trial from the service in disgrace, are still not in the military service.*" [United States v Tyler, 105 US 244, 26 L ed 985. Emphasis supplied.]

In Closson v Armes, supra, the Court of Appeals of the District of Columbia, stated:

"This case is not that of a civilian ruthlessly imprisoned by arbitrary military authority. The appellee is an officer of the army of the United States, entitled to wear its uniform and to draw pay as such, and by express provision of the statute law of the United States for the government of the army, made subject to the rules and articles of war, and to trial by court-martial for any infraction of those articles. Rev Stats US, sec 1256. Nor is the force of the statute broken by the fact that the duties of a retired officer, such as the appellee is, are of an exceedingly limited character, being restricted substantially to drawing his pay, reporting his place of residence to the War Department monthly, and being assignable to duty at the Soldiers' Home, and, at his own request, to duty as professor in any college; and that, subject to these restrictions, a retired officer of the army may enter into any private business into which he chooses to embark, not inconsistent with his duties to the United States. In the nature of things, some of the articles of war cannot apply to retired officers, for the reason that either in express terms or by neces-

sary implication, they concern the duties of those in active service. But so far as the articles of war can be applicable to the retired officer of the army, the statute unquestionably makes these latter subject to them and to all the processes of the military law for all offences committed by them in violation of those articles."

In United States v Fenno, 167 F 2d 593, the Circuit Court of Appeals for the Second Circuit, discussing an earlier statute making members of the Fleet Reserve subject at all times to the laws, regulations, and orders for the government of the Navy[4] stated:

"Nor do we find this statute to be unconstitutional. The Fleet Reserve is so constituted that it falls reasonably and readily within the phrase 'naval forces' in the Fifth Amendment. Its membership is composed of trained personnel who are paid on the basis of their length of service and remain subject to call to active duty. While keeping Fleet Reservists on such pay, Congress has, to be sure, also allowed them to accept employment in civilian capacities. But this need not, and does not, materially diminish their obligations as members of the Fleet Reserve. During the time they are on inactive duty, they remain immune from discharge, with its accompanying loss of pay, except as the statute provides. The government at the same time obtains the benefit of having a trained body of men subject to recall to active duty when needed. To exclude Fleet Reservists while in this status from a classification within the 'naval forces' would be, we think, to construe the broad terms of the Fifth Amendment much too narrowly."

Not without significance is the language of President Wilson in his veto of a measure which would have terminated amenability of retired personnel to trial by court-martial. This is what he said:

"The original act establishing the retired list of the Army (act of Aug. 3, 1861) referred to the personnel

[4] 34 USC (1946 ed) § 853 (d).

therein included as only partially retired, and provided that a retired officer should be entitled to wear the uniform of his grade, should be borne on the Army Register, and should be subject to the rules and Articles of War, and to trial by general court-martial for any breach of these articles. By the act of July 24, 1876, officers of the Army on the retired list were specifically declared to constitute a part of the Regular Army, a provision which is found repeated in subsequent acts affecting the organization of the Army; and other statutes enacted during this period made retired officers of the Army available for certain classes of active duty, in time of peace with their consent, and in time of war without their consent. By the recently enacted national defense act, the authority of the President over retired officers has been further extended so as to make them subject to his call in time of war for any kind of duty without any restriction whatever. Courts and Attorneys General have in a long line of decisions held that officers of the Army on the retired list hold public office. It thus appears that both the legislative and judicial branches have drawn a sharp distinction in status between retired officers, who are regarded and governed at all times as an effective reserve of skilled and experienced officers and a potential source of military strength, and mere pensioners, from whom no further military service is expected. Officers on the retired list of the Army are officers of the Army, members of the Military Establishment distinguished by their long service, and, as such, examples of discipline to the officers and men in the active Army. Moreover, they wear the uniform of the Army, their education and service hold them out as persons especially qualified in military matters to represent the spirit of the Military Establishment, and they are subjected to active duty in time of national emergency by the mere order of the Commander in Chief. They are, therefore, members of the Army, officers of the United States, exemplars of discipline, and have in their keeping the good name and the good spirit of the entire Military Establishment before the world. Occupying such a relation, their subjection to the rules and Articles of War and to trial by general court-martial have always been regarded as necessary, in order that the retired list might not become a source of tendencies which would weaken the discipline of the active land forces and impair that control over those forces which the Constitution vests in the President.

"The purpose of the Articles of War in times of peace is to bring about a uniformity in the application of military discipline which will make the entire organization coherent and effective, and to engender a spirit of cooperation and proper subordination to authority which will in time of war instantly make the entire Army a unit in its purpose of self-sacrifice and devotion to duty in the national defense. These purposes can not be accomplished if the retired officers, still a part of the Military Establishment, still relied upon to perform important duties, are excluded, upon retirement, from the wholesome and unifying effect of this subjection to a common discipline. I am persuaded that officers upon the retired list would themselves regard as an invidious and unpalatable discrimination which in effect excluded them from full membership in the profession to which they have devoted their lives, and of which by the laws of their country they are still members. So long as Congress sees fit to make the retired personnel a part of the Army of the United States, the constitutionality of the proposed exemption of such personnel from all liability under the Articles of War is a matter of serious doubt, leaving the President, as it does, without any means sanctioned by statute of exercising over the personnel thus exempted the power of command vested in him by the Constitution.

"Convinced, as I am, of the unwisdom of this provision and of its baneful effect upon the discipline of

the Army; doubting, as I do, the power of Congress wholly to exempt retired officers from the control of the President, while declaring them to be a part of the Regular Army of the United States, I am constrained to return this bill without my approval." [53 Congressional Record 12844.]

Colonel Winthrop, while expressing strong doubts about jurisdiction over civilians generally, had this to say about jurisdiction over retired personnel:

"That retired officers are a part of the army and so triable by court-martial—*a fact indeed never admitting of question*—is adjudged in Tyler v U. S., 16 Ct Cl, 223; Id., 105 US 244 . . . " [Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 87, footnote 27. Emphasis supplied. See also 29 Op Atty Gen 503.]

Officers on the retired list are not mere pensioners in any sense of the word. They form a vital segment of our national defense for their experience and mature judgment are relied upon heavily in times of emergency. The salaries they receive are not solely recompense for past services, but a means devised by Congress to assure their availability and preparedness in future contingencies. This preparedness depends as much upon their continued responsiveness to discipline as upon their continued state of physical health. Certainly, one who is authorized to wear the uniform of his country, to use the title of his grade, who is looked upon as a model of the military way of life, and who receives a salary to assure his availability, is a part of the land or naval forces.

Left for determination is the applicability of the Articles herein involved to one in a retired status. ▆▆▆ Certainly conduct unbecoming an officer and gentleman—the subject of Charge II—and conduct of a nature to bring discredit upon the armed forces—the subject of Charge III—are offenses which do not depend upon the individual's duty status. Sodomy, the subject of Charge I, is an offense involving moral turpitude, and without doubt necessarily applies to all subject to military law without regard to the individual's duty status.

For the foregoing reasons, we hold that the court-martial had jurisdiction over this accused.

The remaining assignments of error present little difficulty and may be disposed of readily. The accused ▆▆▆ contends that agents of the Office of Naval Investigation procured certain evidence against him in violation of the Fourth Amendment to the Constitution. This evidence consists of the agents' accounts of their observations of the accused's activities while they held his home under surveillance from a neighboring dwelling. Permission to use the latter dwelling for such purposes was obtained from the owners, and at no time did the agents physically go upon the premises occupied by the accused. Such surveillance does not amount to a search, and an unwarranted invasion of privacy is not involved. McDonald v United States, 335 US 451, 93 L ed 153, 69 S Ct 191; Fisher v United States, 205 F 2d 702 (CA DC Cir); Love v United States, 170 F 2d 32 (CA 4th Cir); Paper v United States, 53 F 2d 184 (CA 4th Cir). Furthermore, no objection was made to this evidence at trial. This failure precludes consideration of the question at this level. United States v Dupree, 1 USCMA 665, 5 CMR 93.

In a further assignment, the defense argues that the evidence is legally insufficient to support the findings upon the specification of Charge III. This argument is predicated entirely upon the validity of the foregoing assignment, which we have held lacking in merit. Thus, it need not be further discussed.

Alleged improprieties in the trial counsel's opening statement are the basis of the next defense ▆▆▆ assignment. We have examined with care both the opening statement and all of the evidence presented at the trial. While the record does not bear out each and every item which the prosecutor said

he expected to prove, in exactly the manner described, the general import of the evidence is consistent with the opening remarks. In any event, whatever variance existed between them is entirely too slight to have any noticeable effect upon the triers of fact. The most important of the variances alleged is that relating to the witness McDaniels. This individual testified that after he was first interrogated by naval investigators, he advised the accused. A meeting between the pair was then arranged in a San Diego restaurant where the details of the interrogation were discussed. According to McDaniels, the accused advised him that if "he [the accused] was convicted of anything, that we would all be drug down by it." He then informed McDaniels he could disavow his earlier statement and deny that the acts he had described had ever occurred inasmuch as the first statement was not under oath. McDaniels then acknowledged that at the pretrial investigation he denied the accused's complicity in any of the offenses, and in so doing committed perjury.

In their testimony the other witnesses made similar acknowledgments of perjury before the pretrial investigator.

In view of this testimony, trial counsel's opening statement, that the accused had so instructed McDaniels, and "all three did as requested and perjured themselves at the pretrial," was merely fair comment upon the testimony he expected to produce. Cf. United States v Doctor, 7 USCMA 126, 21 CMR 252.

The defense next contends the law officer improperly curtailed cross-examination of prosecution witnesses Schmidt and Mc-Daniels. On direct examination, Schmidt testified to the three separate acts of sodomy alleged in three specifications of Charge I. Under cross-examination, he acknowledged he had been granted immunity from prosecution for perjury committed at the pretrial investigation. After admitting his pretrial exculpation of the accused to be a lie, further cross-examination developed the admission that such testimony amounted to perjury. The defense counsel then sought to retrace each of the statements made, but the law officer sustained a prosecution objection, declaring the matters had been covered adequately.

Undoubtedly cross-examination of prosecution witnesses stands at the forefront of the rights afforded accused individuals under our scheme of justice. This right is best protected by affording the cross-examiner reasonable latitude in the scope and extent of his interrogation. However, some limits are required, and courts generally have left these limits to the determination of the trial judge in the exercise of his sound discretion. Alford v United States, 282 US 687, 75 L ed 624, 51 S Ct 218; United States v Heims, 3 USCMA 418, 12 CMR 174.

In the instant case, the law officer's ruling with respect to the cross-examination of Schmidt was a proper exercise of his discretion. The witness had admitted that his pretrial statement exculpating the accused was perjury. To permit counsel to recite each and every portion of that statement would serve no useful purpose, for the optimum of impeachment had already been obtained. In this particular, we note the accused was acquitted of two of the specifications concerning which this witness testified. Schmidt's testimony with reference to them was uncorroborated. His testimony relative to the single specification of which the accused was convicted under Charge I was corroborated, in part, by testimony of the Intelligence agents. Under the circumstances, we conclude the accused was not prejudiced by the curtailment.

The same considerations apply to the testimony of the witness McDaniels, and nothing presented by the record or the arguments of counsel require further elaboration upon that portion of the assignment respecting it.

The next assignment requiring discussion challenges the sufficiency of the specification of Charge II to state an offense under Article 133 of the Uniform Code, supra. That specification alleges that the accused "publicly associate[d] with persons known to be sexual devi-

646

ates, to the disgrace of the armed forces."

Historically, conduct violative of this Article is defined as "action or behavior in an official capacity which, in dishonoring or disgracing the individual . . . personally, seriously compromises his standing as an officer." Manual for Courts-Martial, United States, 1951, paragraph 212; Winthrop's Military Law and Precedents, 2d ed, 1920 reprint, pages 711, 712. Instances of such conduct cited by each of the foregoing authorities include "public association with notorious prostitutes." The defense seeks to equate this example to the offense sought to be alleged in the specification in question. The gist of that offense, according to the defense argument, is the unfavorable reaction upon the minds of those who might observe the association. United States v Sparhawk, 24 BR 127; United States v Stroud, 48 BR 231. Hence, the failure of this specification to allege the notorious character of the individuals associated with is fatal.

While the provisions of the security regulations might cast strong doubt upon the necessity for showing that notoriety attends every such association[5]—a circumstance which we need not here determine—the present specification sufficiently alleges that element. It avers that the individuals were "known to be sexual deviates" and that the accused's association with them was "to the disgrace of the armed forces." Manifestly, this combination of allegations imports the element of "notorious," for, if the association is completely unknown, or, if the characters of the individuals are unknown, the armed forces would not be disgraced. See United States v Sparhawk, supra. The capacity of such association to dishonor or disgrace the accused as an individual, and seriously compromise his standing as an officer, is patent. Thus, the specification is not deficient.

The law officer's instructions upon this offense were consistent with these views. There is, therefore, no necessity for discussing a defense contention that they were defective.

This brings us to one further assignment of error relating to the specification of Charge II. The ▆▆▆▆▆▆▆ accused contends that by permitting Government witnesses to testify that certain individuals were homosexuals, the law officer erred to his prejudice. This refers to testimony of Schmidt, McDaniels, and agent Strolin. As a law enforcement officer, the latter certainly was in a position, as indicated by his testimony, to know the reputation of the individuals with whom the accused associated. Both Schmidt and McDaniels were admitted deviates of long-standing. Each asserted thorough knowledge of the activities of all those with whom the accused associated on the occasion in question. The sum total of these activities was expressed by these witnesses in the conclusion now objected to. Without detailing the specifics of the depravity involved, it is sufficient to here record that their testimony was not an expression of opinion upon the meaning of certain traits or tendencies nor upon a hypothetical situation. They described acts which leave no doubt about the accuracy of their characterizations. Thus, there was no error in receiving this testimony.

A final assignment relative to Charge II challenges the sufficiency of the evidence to support the findings thereon. This is predicated upon the assumption that since the association occurred solely in the presence of sexual deviates, the element of disgrace to the services is necessarily lacking. This argument misconceives the evidence, for the conduct was observed by Intelligence agents, and at least one female was present. Assuming the correctness of the defense estimate of the evidence, the fallacy of this argument is completely demonstrated by this Court's opinion in United States v Berry, 6 USCMA 609, 20 CMR 325.

Other assignments relate to alleged

[5] United States Navy Regulations, Article 1510; United States Navy Security Manual for Classified Matter; Army Regulations 604–5 and 604–10; Air Force Regulation 205–6.

improper remarks by trial counsel during the course of trial, the characterization of the accused as "a very immoral man" by one of the witnesses, improper use of the Manual for Courts-Martial, supra, by court members, and destruction of certain photographs. None of these assignments are meritorious.

The accused next asserts that the post-trial review of the staff legal officer is fatally deficient in two particulars. First, he omitted all mention of the evidence produced by the defense, and, second, he expressed no opinion as to the adequacy and weight of the evidence as a whole. The Government concedes the review is defective and a new review is required. Our examination of the review indicates this concession is proper. United States v Fields, 9 USCMA 70, 25 CMR 332; United States

v Grice, 8 USCMA 166, 23 CMR 390; United States v Johnson, 8 USCMA 173, 23 CMR 397.

Our disposition of the latter assignment makes unnecessary further consideration of a claim that the convening authority's issuance of letters of immunity to prosecution witnesses disqualified him from reviewing the record of trial.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Navy for reference to another reviewing authority for further proceedings under Articles 61 and 64, Uniform Code of Military Justice, 10 USC §§ 861, 864.

Judges LATIMER and FERGUSON concur.