UNITED STATES, Appellee

v

ROBERT G. GALLAGHER, Private First Class,
U. S. Army, Appellant

15 USCMA 391, 35 CMR 363

No. 18,212

May 21, 1965

Richard A. Baenen, Esquire, argued the cause for Appellant, Accused. With him on the brief were Daniel H. Benson, Esquire, and Captain Clifford B. Hearn, Jr.

Captain Michael E. Phenner argued the cause for Appellee, United States. With him on the brief were Colonel Edwin G. Schuck and Lieutenant Colonel Francis M. Cooper.

Lawrence Speiser, Esquire, American Civil Liberties Union, argued amicus curiae. With him on the brief was Joseph S. Lobenthal, Jr., Esquire.

## Opinion of the Court

KILDAY, Judge:

Private First Class Robert G. Gallagher was convicted by a general court-martial convened by the Commanding General of the 3d Armored Division (Spearhead), in Germany, of robbery, in violation of Article 122, Uniform Code of Military Justice, 10 USC § 922. He was sentenced to total forfeitures, reduction to the lowest enlisted grade, confinement at hard labor for one year, and a bad-conduct discharge. The convening authority approved the sentence. A board of review in the office of The Judge Advocate General of the United States Army affirmed and, a motion for reconsideration having been filed, the board of review reaffirmed its previous decision.[1]

In due time, petitioner filed with this Court, pursuant to Article 67(b)(3), Uniform Code of Military Justice, 10 USC § 867, a petition for grant of review. Upon consideration of that petition by this Court, the same was denied. Thereupon, petitioner filed with this Court his petition for reconsideration. This Court, by order, directed that the petition for reconsid-

[1] Prior to the original action of the board, the Secretary of the Army took action suspending the bad-conduct discharge and the confinement and forfei- tures remaining unserved, with a provision for remission upon completion of appellate review.

eration be set for oral argument and that briefs be filed by counsel for both parties.

The American Civil Liberties Union having moved for leave to file a brief and participate in oral argument as *amicus curiae,* such motion was, by order of the Court, granted.

All briefs having been filed and oral argument held, we proceed to the disposition of the petition for reconsideration.

The petitioner presents the following question:

Whether Congress can constitutionally prefer by rank alone some convicted individuals and thus discriminate against other convicted individuals by according the former, alone, appellate review and decision on the merits as a matter of right.

This question brings forward for our consideration and review that portion of Article 67 of the Uniform Code, supra, which reads as follows:

"(b) The Court of Military Appeals shall review the record in the following cases:

"(1) all cases in which the sentence, as affirmed by a board of review, affects a general or flag officer or extends to death;'

"(2) all cases reviewed by a board of review which the Judge Advocate General orders sent to the Court of Military Appeals for review; and

"(3) all cases reviewed by a board of review in which, upon petition of the accused and on good cause shown, the Court of Military Appeals has granted a review."

Petitioner relies upon the case of Griffin v Illinois, 351 US 12, 100 L ed 891, 76 S Ct 585 (1956). In that case, the Supreme Court held that the Illinois statute which granted the defendant convicted in a criminal case an appeal to the Supreme Court of Illinois as a matter of right but required the defendant, even though indigent, to pay the cost of a transcript of the trial proceedings in order to secure full review by the Supreme Court of the state, con-

stituted invidious discrimination and was therefore violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Constitution of the United States. Petitioner also cites the following cases in support of his contention. Each of the following named cases involves some phase of inequality in appeal because of the indigency of the defendant. Burns v Ohio, 360 US 252, 3 L ed 2d 1209, 79 S Ct 1164 (1959); Douglas v California, 372 US 353, 9 L ed 2d 811, 83 S Ct 814 (1963); Lane v Brown, 372 US 477, 9 L ed 2d 892, 83 S Ct 768 (1963); Draper v Washington, 372 US 487, 9 L ed 2d 899, 83 S Ct 774 (1963).

It will be noted that all of the cases upon which petitioner relies were directed against the action of one of the states. We point out that the provisions of the Fourteenth Amendment apply to the states but not to the Federal Government. The Fourteenth Amendment contains a provision for the equal protection of the laws. No provision of the Constitution contains a provision guaranteeing equal protection of the laws against actions of the Federal Government, there being only the due process of law clause of the Fifth Amendment. This distinction was pointed out quite clearly by Mr. Chief Justice Warren in Bolling v Sharpe, 347 US 497, 98 L ed 884, 74 S Ct 693 (1954), wherein he said:

"We have this day held that the Equal Protection Clause of the Fourteenth Amendment prohibits the states from maintaining racially segregated public schools. The legal problem in the District of Columbia is somewhat different, however. The Fifth Amendment, which is applicable in the District of Columbia, does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states. But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable

phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process."

See also Helvering v Lerner Stores Corp., 314 US 463, 86 L ed 343, 62 S Ct 341 (1941); Detroit Bank v United States, 317 US 329, 87 L ed 304, 63 S Ct 297 (1943).

Notwithstanding the Equal Protection Clause of the Fourteenth Amendment, the states may make classifications.

"The rule is well settled that a state may classify persons and objects for the purpose of legislation and pass laws applicable only to persons or objects within a designated class, for the purpose of obtaining revenue, applying the police power, strictly so-called, or increasing the industries of the state, developing its resources, or adding to its wealth and prosperity. As a matter of fact, as some of the courts have remarked, all legislation involves classification; from the earliest days classification has been made by legislatures whereby some people have rights or suffer burdens which others do not. A differentiation is not necessarily a discrimination. And since the very idea of classification is inequality, inequality in no manner determines the question of constitutionality." [16 Am Jur 2d, Constitutional Law, § 494.]

In Charles C. Steward Mach. Co. v Davis, 301 US 548, 81 L ed 1279, 57 S Ct 883 (1937), in speaking of classifications, and the absence from the Fifth Amendment of the equal protection clause of the Fourteenth Amendment, the Court stated, at page 584,

". . . If this latitude of judgment is lawful for the states, it is lawful, a fortiori, in legislation by the Congress, which is subject to restraints less narrow and confining."

In Griffin v Illinois, supra, relied upon by petitioner, Mr. Justice Frankfurter, in his concurring opinion, recognized the authority of the states to make classifications in connection with appeals:

"Nor does the equal protection of the laws deny a State the right to make classifications in law when such classifications are rooted in reason. 'The equality at which the "equal protection" clause aims is not a disembodied equality. The Fourteenth Amendment enjoins "the equal protection of the laws," and laws are not abstract propositions.' Tigner v Texas, 310 US 141, 147, 84 L ed 1124, 1128, 60 S Ct 879, 130 ALR 1321. Since capital offenses are sui generis, a State may take account of the irrevocability of death by allowing appeals in capital cases and not in others. Again, 'the right of appeal may be accorded by the State to the accused upon such terms as in its wisdom may be deemed proper.' McKane v Durston, 153 US 684, 687, 688, 38 L ed 867, 868, 14 S Ct 913. The States have exercised this discriminating power. The different States and the same State from time to time have conditioned criminal appeals by fixing the time within which an appeal may be taken, *by delimiting the scope of review, by shaping the mechanism by which alleged errors may be brought before the appellate tribunal,* and so forth." [Griffin v Illinois, supra, 351 US, at page 21.] [Emphasis supplied.]

In United States v Heinze, 218 US 532, 545–46, 54 L ed 1139, 31 S Ct 98 (1910), the Supreme Court had before it the validity of the act of March 2, 1907, granting to the Government the right to review by the Supreme Court, on writ of error, in certain criminal cases, in instances where a trial court by decision or judgment sustained a demurrer to an indictment. The statute gave no similar appeal to an accused when a demurrer was overruled. Thus the accused was limited to review by the Circuit Court and only after trial and conviction. In sustaining the validity of the statute, Mr. Justice McKenna stated:

"It is contended by the defendant that the act of March 2, 1907, is not applicable to the case, because the right it offers is 'wholly unilateral.' 'It opens the door of this court,' it is said, 'to the United States as one

**393**

party to the cause only, and denies the same privilege to the defendant.' The ultimate contention is that defendant is thereby denied the equal protection of the laws. This inequality is asserted because the United States is given an appeal to this court, and before trial, and a defendant is only given right of review in the circuit court of appeals, and only at the end of the trial. The defendant is put to expense and peril, it is urged, though the indictment against him may be wholly bad, 'and is, at every stage of the case, forbidden the right of review upon any question in the Supreme Court, except the construction or application of the Constitution or the constitutionality of any Federal statute.' And this, it is insisted, is the denial of due process of the law as well as the denial of the equal protection of the laws. We shall not follow the somewhat roundabout argument to establish the identity of those two rights. If we should yield to the argument, it would necessarily follow that if defendant has not been denied due process, he has not been denied the equal protection of the law, and this court has decided that the right of appeal is not essential to due process of law. Reetz v Michigan, 188 US 505, 508, 47 L ed 563, 566, 23 Sup Ct Rep 390. The provisions have definite application, and even if the explicit clause of the 14th Amendment, forbidding a state to deny to any person within its jurisdiction the equal protection of its laws, can be said to apply to the United States, it can have no broader meaning when so applied than when applied to the states. Assuming, therefore, and assuming only, not deciding (see the District of Columbia v Brooke, 214 US 138, 149, 53 L ed 941, 945, 29 Sup Ct Rep 560), that Congress may not discriminate in its legislation, it certainly has the power of classification, and the act of March 2 is well within such power."

In District of Columbia v Brooke, 214 US 138, 149, 53 L ed 941, 29 S Ct 560 (1909), Mr. Justice McKenna, speaking of the power of Congress to discriminate, or formulate classifications, stated:

"However, the question of the power of Congress, broadly considered, to discriminate in its legislation, is not necessary to decide, for, whether such power is expressly or impliedly prohibited, the prohibition cannot be stricter or more extensive than the 14th Amendment is upon the states. That amendment is unqualified in its declaration that a state shall not 'deny to any person within its jurisdiction the equal protection of the laws.' Passing on that amendment, we have repeatedly decided—so often that a citation of the cases is unnecessary—that it does not take from the states the power of classification."

See also District of Columbia v Clawans, 300 US 617, 81 L ed 843, 57 S Ct 660 (1937), and Andrews v Swartz, 156 US 272, 39 L ed 422, 15 S Ct 389 (1895).

The power of the states, and of the Federal Government, to make classifications is subject to the limitation that the classification not be arbitrary or capricious, and rests upon some reasonable difference. This limitation has been recognized by the Supreme Court in numerous opinions. The following quotation from Mr. Justice Whittaker in Allied Stores of Ohio v Bowers, 358 US 522, 527, 3 L ed 2d 480, 79 S Ct 437 (1959), will serve to illustrate similar holdings in other cases:

"But there is a point beyond which the State cannot go without violating the Equal Protection Clause. The State must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary. The rule often has been stated to be that the classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.' . . . 'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' . . . That a statute may discriminate in favor of a certain

class does not render it arbitrary if the discrimination is founded upon a reasonable distinction, or difference in state policy."

A review of Articles 66, 67, 68, 69, and 71, Uniform Code of Military Justice, 10 USC §§ 866, 867, 868, 869, and 871, makes it abundantly clear that the Congress made a painstaking effort to establish a system of meaningful review and confirmation of court-martial cases by the classification of cases to be reviewed at various stages of the review process. It is abundantly clear that should identical review of all cases —regardless of the class of court-martial by which tried, the sentence imposed, or the rank of the accused—be required, uniformity would have been indeed achieved. However, that uniformity would have been in the denial of meaningful review to all persons tried by court-martial. It is evident that the sheer weight of numbers would render review of all cases by the Court of Military Appeals meaningless. For, the Annual Report of the United States Court of Military Appeals and The Judge Advocates General of the Armed Forces and the General Counsel of the Department of the Treasury, submitted in 1965, in compliance with Article 67 (g), Uniform Code of Military Justice, 10 USC § 867, shows that for the year ending June 30, 1964, there was a total, in all of the services, of 76,057 court-martial cases, and a total of 4,992 cases were reviewed by boards of review. Should petitioner's contention prevail, clearly the Court would have been required to hear, by oral argument and decision on the merits, all of the 4,992 cases heard by boards of review, and we can only speculate that it would later be argued such hearings would be necessary in all of the 76,057 cases tried by courts-martial. It requires no illumination to make clear that meaningful review could not be accorded either of such large number of cases.

Article 67(b), Uniform Code of Military Justice, supra, is markedly similar to Section 1254, Title 28, United States Code, providing the method of review of cases in the courts of appeals by the Supreme Court. No matter what the effect of Section 2, Article III of the Constitution may be, we believe a counterpart exists under Clause 14, Section 8, Article I, thereof, giving to Congress the power to make rules for the Government and regulation of the land and naval forces. See Ex parte Republic of Peru, 318 US 578, 87 L ed 1014, 63 S Ct 793 (1943).

Conceding that Article 67(b)(3) of the Code, supra, provides review by the Court in "all cases reviewed by a board of review in which, upon petition of the accused and on good cause shown, the Court of Military Appeals has granted a review," still it should be self-evident that a review by the judges of the Court is essential to determine whether "good cause" has been shown, whether the Court determines to hear arguments and further proceedings or not. Rule 18, of the Rules of Practice and Procedure of this Court, requires the appellant to file a petition for review and contemplates that he shall state therein the errors of which he complains, and Rule 40 permits the appellant to file a brief in support thereof; Rules 21 and 40 require the Government to reply to the petition for review and permit a brief in support of its contentions. Thus the consideration given to the petition for review, is, in fact, a substantial review based upon arguments in writing. Moreover, regardless of the specific assignments of error raised in the pleadings, the Court examines the record to determine if there may be other possible infirmities. See Annual Report of the United States Court of Military Appeals for 1960, at page 6.

The overall importance in command, direction and achievement of victory of generals and flag officers sets them apart within the military establishment. The travail of President Lincoln in seeking a general who could fight and win the Civil War evidences that they are *sui generis* within the military. All generals and flag officers of the regular and reserve components, whether for permanent or temporary rank, are nominated by the President and confirmed by the Senate, while only permanent ranks in the regular service below the rank of general or flag officer require such nominations of the rank.

Under the "Officer Personnel Act of 1947," 61 Stat 795, the total of general and flag officers on the active list at any one time were distributed (limited), for practical purposes, in the proportion of seventy-five one-hundredths of one percent of total officer strength. Under the "Officer Grade Limitation Act of 1954," 68 Stat 65, 10 USC §§ 3202, 8202, 5442, and 5443, this proportion was converted to finite numbers, each depending upon the total commissioned officers on active duty. The provisions of the last-cited statute had the effect of reducing the proportion of general and flag officers, for practical purposes, to the range of sixty one-hundredths of one percent of officer strength. The proportion has been consistently reduced by the numbers the Senate has been willing to confirm.[2] It therefore becomes evident that an infinitesimal fraction of one percent of the officers and enlisted personnel subject to the Uniform Code of Military Justice have available to them the automatic review by this Court under Article 67(b)(1) of the Code, supra. It is also apparent that the norm established by the Code is review by this Court under the provisions of Article 67(b)(3), upon petition of the accused and on good cause shown. It is equally clear that this accused was denied nothing granted to others in his classification. Granting automatic review to a relative handful of general and flag officers deprived the petitioner of nothing, even though a special advantage may have accrued to the general and flag officers.[3] As stated by Mr. Justice Whittaker, in Allied Stores of Ohio v Bowers, supra, at page 528:

". . . That a statute may discriminate in favor of a certain class does not render it arbitrary if the discrimination is founded upon a reasonable distinction, or difference in state policy."

Because of the greatly restricted number of generals and flag officers, members of such exalted rank have, on numerous occasions, been deprived of the benefit of Article 25(d)(1), Uniform Code of Military Justice, 10 USC § 825, and its ancient predecessor provisions. That Article provides:

"When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade."[4]

We can perceive here, at least one of the reasons which may have prompted the provisions for approval by the President in cases affecting generals and flag officers. The ranks of general and flag officer are the most coveted in the military hierarchy, so even the appearance of procuring a vacancy in the exalted rank is avoided by requiring Presidential approval. In our history, high ranking generals have been tried by courts-martial containing members junior to themselves. In view of the continued severe restrictions on the number of generals and flag officers dispersed worldwide, we have no assurance it could not happen again.[5]

The provision of the Code with which

---

[2] Thus, with an overall military strength of the range of two million eight hundred thousand, the Officer Grade Limitation Act of 1954 allowed a total of 1,304 general and flag officers. However, there were on active duty only a total of 1,247 general and flag officers of all ranks and in all of the military services, exclusive of certain general officers on duty in other agencies and denominated "reimbursables" and certain retired general and flag officers recalled to active duty.

[3] The records and reports of this Court show that, in its history, automatic review of only one general officer has been considered by it. United States v Grow, 3 USCMA 77, 11 CMR 77. Likewise, only one flag officer has secured automatic review. United States v Hooper, 9 USCMA 637, 26 CMR 417.

[4] Winthrop, in his treatise, Military Law and Precedents, 2d ed, 1920 Reprint, at page 72, discusses a precursor of Article 25 as follows:

"This Article, with a view to the excluding, as far as reasonably practicable, from courts-martial, officers who as junior to the accused may have an interest in procuring him to be dismissed, suspended, &c. . . ."

[5] In Winthrop, supra, at page 73, footnote 23, reads, in part, as follows:

"On some of the principal trials of

we are concerned is in marked contrast to the situation existing in Griffin v Illinois, supra, and other cases cited by the petitioner. In each of those cases the accused was deprived of an appeal available not only to others of his classification, but practically all others convicted of crime, solely because of his indigency. In short, the accused in each case was denied any right of appeal available to others generally, rather than, as here, an insignificant number being granted an advantage not available to him. See Mr. Justice Frankfurter's concurring opinion in Griffin v Illinois, supra.

The first sentence of Article 71(a), Uniform Code of Military Justice, 10 USC § 871, reads as follows:

"No court-martial sentence extending to death or involving a general or flag officer may be executed until approved by the President."

This provision was not new with the adoption of the Code. Actually, the requirement for approval or confirmation by the President, in the instances stated, is older than the Constitution itself.

The British Articles of War of 1765, in force at the beginning of our Revolutionary War, by Article X, Section XV, thereof, provided that no sentence of a general court-martial should be put in execution, until after a report should be made of the whole proceedings to the King or his General or Commander-in-chief and the King's or such General's or Commander's directions should be signified thereupon.[6]

On September 20, 1776, some 78 days after our Declaration of Independence, the Continental Congress enacted Articles of War. Section XIV, Article 8, thereof provided:

"No sentence of a general court-martial shall be put in execution, till after a report shall be made of the whole proceedings to Congress, or to the general or commander in chief of the forces of the United States, and their or his directions be signified thereupon."[7]

The Continental Congress, on May 31, 1786, enacted new Articles of War. Article 2, thereof, provided, in part, as follows:

". . . [N]either shall any sentence of a general court-martial in time of peace, extending to the loss of life, the dismission of a commissioned officer, or which shall either in time of peace or war respect a general officer, be carried into execution, until after the whole proceedings shall have been transmitted to the secretary at war, to be laid before Congress for their confirmation, or disapproval, and their orders on the case. All other sentences may be confirmed and executed by the officer ordering the court to assemble, or the

---

general officers in our army, the rank of the members of the court was as follows: Maj. Gen. Chas. Lee, (1778,)—1 maj. gen., 4 brig. gens., 8 cols.; Maj. Gen. Arnold, (1779,)—1 maj. gen., 3 brig. gens., 9 cols.; Brig. Gen. Hull, (1813,)—1 maj. gen., 1 brig. gen., 4 cols., 7 lieut. cols.; Maj. Gen. Wilkinson, (1814,)—2 maj. gens., 3 brig. gens., 7 cols., 1 lieut. col.; Maj. Gen. Gains, (1816,) —1 maj. gen., 3 brig. gens., 3 cols., 6 lieut. cols.; Bvt. Maj. Gen. Twiggs, (1858,)—3 bvt. maj. gens., 2 bvt. brig. gens., 5 cols., 2 bvt. cols., 5 lieut. cols.; Maj. Gen. Porter, (1862,) —2 maj. gens., 7 brig. gens.; Brig. Gen. Hammond, (1864,)—1 maj. gen., 8 brig. gen.; Brig. Gen. Swaim, (1884.)—1 maj. gen., 5 brig. gens., 7 cols; Brig. Gen. Hazen, (1885,)— 2 maj. gens., 8 brig. gens., 3 cols."

[6] Reprinted in Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 943. Article XV thereof provided that no commissioned officer should be cashiered or dismissed from the service except by order of the King, or by the sentence of a general court-martial, approved by the King or by the General or Commander-in-Chief. Ibid., page 944. See Article 71(b), Uniform Code of Military Justice, 10 USC § 871.

[7] Reprinted in Winthrop, supra, page 968. This constituted a reenactment of the British Articles of War, with "Congress" being substituted for the King. There was no President of the United States under the Articles of Confederation.

commanding officer for the time being, as the case may be."[8]

Thus it will be seen that at a very early date, and prior to the adoption of our Constitution, classifications were made as to the officer or agency of Government which possessed the power of final review and approval of the sentences of courts-martial.

At its first session, the First Congress provided that the troops should continue to be governed by the Articles of War previously established by the United States in Congress assembled. Act of September 29, 1789, 1 Stat 96. At its second session, the First Congress again provided, "the commissioned officers, non-commissioned officers, privates and musicians" should "be governed by the rules and articles of war, which have been established by the United States in Congress assembled." Act of April 30, 1790, 1 Stat 121.

The Ninth Congress at its first session, by the Act of April 10, 1806, enacted new "rules and articles by which the armies of the United States shall be governed." 2 Stat 359. Article of War 65 thereof reads as follows:

"ART. 65. Any general officer commanding an army, or Colonel commanding a separate department, may appoint general courts-martial whenever necessary. But no sentence of a court-martial shall be carried into execution until after the whole proceedings shall have been laid before the officer ordering the same, or the officer commanding the troops for the time being; neither shall any sentence of a general court-martial, in the time of peace, extending to the loss of life, or the dismission of a commissioned officer, or which shall, either in time of peace or war, respect a general officer, be carried into execution, until after the whole proceedings shall have been transmitted to the Secretary of War, to be laid before the President of the United States for his confirmation or disapproval, and orders in the case. All other sentences may be confirmed and executed by the officer ordering the court to assemble, or the commanding officer for the time being, as the case may be."[9]

The revision of the Articles of War, enacted by the Congress June 22, 1874, contained Article 108, reading as follows:

"No sentence of a court-martial, either in time of peace or in time of war, respecting a general officer, shall be carried into execution, until it shall have been confirmed by the President."[10]

Language to the same effect is contained in Article of War 48, of the Act of August 29, 1916, Manual for Courts-Martial, U. S. Army, 1917; in Article of War 48, of the Act of June 4, 1920, Manual for Courts-Martial, U. S. Army, 1928; in Article of War 48, of the Elston Act of 1948, Manual for Courts-Martial, U. S. Army, 1949. And finally we have the language of Article 71(a) of the Uniform Code of Military Justice quoted, supra.

We perceive nothing unreasonable in the provision that sentences extending to death or affecting a general or flag officer shall be approved by the President. The antiquity of the provision, and the number of times it has been re-enacted beginning with enactment by the Continental Congress, and never omitted from the adoption of various Articles of War and the Code, have imbedded it firmly in our system of military justice.

Nor is there anything unreasonable in the provision of the Code that, in these two instances, this Court shall review the record, even though other records may be reviewed upon petition of the accused and on good cause shown.

[8] Reprinted in Winthrop, supra, page 972. The Constitution was finally ratified in July 1788, and the First Congress was scheduled to assemble on March 4, 1789. It was late in assembling, and it was not until April 30, 1789, that George Washington was inaugurated as the First President of the United States. There was still no President when the Articles of 1786 were enacted.

[9] Reprinted in Winthrop, supra, page 982.

[10] Reprinted in Winthrop, supra, page 995.

The Congress having readopted the provision for approval by the President in sentences extending to death or involving a general or flag officer, it is fitting that it made review in these very important instances by the new civilian review authority mandatory. Their importance is sufficient to claim a portion of the time of one so beset with problems .as is our Chief Executive. Reasonable, indeed, then, is the provision which relieves him of the burden of reviewing those cases which are reversed by the Court of Military Appeals. Reasonable, also, is the provision which makes available to him the view of the impartial civilian judges who affirm such a sentence.[11]

In its report[12] on the bill establishing a Uniform Code of Military Justice, the Senate Committee on Armed Services stated:

"*Article 67. Review by the Court of Military Appeals*

"This article is new although the concept of a final appellate tribunal is not. Proposed AGN, article 39 (g) provides for a board of appeals while AW 50 (a) provides for a judicial council. Both of these tribunals, however, are within the Department. The Court of Military Appeals provided for in this article is established in the National Military Establishment for the purpose of administration only, and will not be subject to the authority, direction, or control of the Secretary of Defense. The terms of the judges are fixed at 8 years.[13] The judges are to be highly qualified civilians and for this reason the compensation has been made the same as that of a judge of the United States Court of Appeals.

. . . . .

"Automatic review before the Court of Military Appeals is provided for all cases which must be approved by the President. (See AW 71.), The Judge Advocate General may direct that a case be reviewed by the court, and an accused may request review and will receive it where the court finds good cause."[14]

We hold that Article 67 (b) (1) of the Uniform Code of Military Justice, supra, is not unreasonable. It is not arbitrary, it is not capricious, it is based upon a reasonable distinction or difference in policy, and constitutes a reasonable classification; it does not deprive petitioners of due process of law, and it is a valid provision of law. 16 Am Jur 2d, Constitutional Law, § 494; Griffin v Illinois; United States v Heinze; Allied Stores of Ohio v Bowers, all supra.

The petition for reconsideration is denied.

Chief Judge QUINN and Judge FERGUSON concur.

---

[11] Again, we are left to speculation as to whether it would be later argued that the provision for Presidential approval of sentences extending to death, or affecting a general or flag officer, requires approval by the President of all court-martial sentences.

[12] Senate Report No. 486, 81st Congress, 1st Session, June 10, 1949, pages 28 and 29.

[13] The House Bill had provided life tenure. The Conference Committee fixed the terms at fifteen years.

[14] In House Report No. 491, 81st Congress, 1st Session, April 28, 1949, at page 32, the Committee on Armed Services of the House of Representatives included similar language in explanation and justification of Article 67, Uniform Code of Military Justice.