*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
CRISFIELD, FULTON, and HITESMAN,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Stephen A. BEGANI**
Chief Petty Officer (E-7), U.S. Navy, Retired
Appellant

**No. 201800082**

Argued: 29 Mar 2019[1]—Decided: 31 July 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Captain Stephen C. Reyes, USN. Sentence adjudged 1 December 2017 by a general court-martial convened at Fleet Activities Yokosuka, Japan, consisting of a military judge sitting alone. Sentence approved by convening authority: confinement for 18 months and a bad-conduct discharge.

For Appellant: Lieutenant Daniel E. Rosinski, JAGC, USN (argued and on brief).

For Appellee: Lieutenant Timothy C. Ceder, JAGC, USN (argued); Captain Brian L. Farrell, USMC (on brief); Lieutenant Kimberly Rios (on brief).

_____

[1] We heard oral argument in this case at Pennsylvania State University Law School, State College, Pennsylvania.

Chief Judge CRISFIELD delivered the opinion of the Court, in which Senior Judge FULTON and Senior Judge HITESMAN joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

CRISFIELD, Chief Judge:

Congress has determined that some, but not all, military retirees should remain subject to the Uniform Code of Military Justice (UCMJ) while they are retired. Retirees from a regular (i.e., active) component, which in the Navy includes those in the Fleet Reserve, are subject to UCMJ jurisdiction at all times and in all places for as long as they live. Retirees from a reserve component are only subject to the UCMJ while receiving hospitalization from an armed service. The question before us is whether this disparate treatment offends the Due Process Clause of the Fifth Amendment. Applying strict scrutiny to the treatment of these similarly situated groups, we determine that UCMJ jurisdiction over retirees is not narrowly tailored to accomplish the goal of good order and discipline in the armed forces. Accordingly, the sections of the UCMJ subjecting regular component retirees to UCMJ jurisdiction are unconstitutional.

## I. BACKGROUND

On 30 June 2017, after 24 years on active duty, the appellant, Chief Petty Officer Stephen A. Begani retired from active duty and transferred to the Fleet Reserve. He remained in the area of his final duty station, Marine Corps Air Station Iwakuni, Japan, and found employment with a contractor performing aircraft maintenance work for the U.S. military. The appellant soon began communicating with "Mandy," whom he believed to be a 15-year-old female, but was actually an undercover Naval Criminal Investigative Service (NCIS) agent. They communicated through an online chat platform and their communications were sexual in nature. On 5 August 2017, NCIS agents apprehended Mr. Begani when he arrived at an on-base residence on Marine Corps Air Station Iwakuni. The appellant had come to the residence with the intent to have sex with "Mandy," whom he believed was waiting inside.

As a member of the Fleet Reserve, the appellant was subject to UCMJ jurisdiction in accordance with Article 2(a)(6), UCMJ. 10 U.S.C. § 802(a)(6) (2012). Charges were preferred against the appellant and he unconditionally

waived his right to an Article 32, UCMJ, preliminary hearing. Charges were then referred to a general court-martial. The appellant and the convening authority reached a pretrial agreement in which the appellant agreed to waive his right to trial by members and plead guilty. At trial, the appellant pleaded guilty to, and was found guilty of, one specification of attempted sexual assault of a child and two specifications of attempted sexual abuse of a child, in violation of Articles 80 and 120b, UCMJ. He raised no motions at trial other than one arguing that a punitive discharge is not an authorized punishment for a retired Service Member, which was denied.

For the first time on appeal, the appellant argues that the UCMJ's jurisdictional scheme, whereby he, as a retired regular component member, is subject to the UCMJ, while retired Navy Reserve members are not, violates the Fifth Amendment Due Process Clause's guarantee of equal protection of the laws. He argues that this unequal jurisdictional scheme unconstitutionally deprived him of his right to a jury of his peers, the right to a grand jury, and the right to free speech when a similarly situated reserve retiree would enjoy those rights.

The appellant also asserts four other assignments of error: (1) that he is a "former member" of the armed forces and therefore not subject to jurisdiction under the UCMJ; (2) that he did not receive notice that he was subject to UCMJ jurisdiction as required by Article 137, UCMJ; (3) that once retired, a Service Member is no longer subject to a punitive discharge; and (4) that a retired Service Member cannot be subject to court-martial without first being recalled to active duty.[2] Based on our resolution of the appellant's equal protection claim, we need not reach his other assignments of error.

## II. DISCUSSION

### A. Jurisdictional Claim Not Waived by Unconditional Guilty Plea or Pretrial Agreement

As a threshold issue we must determine whether, as the appellee asserts, the appellant waived appellate consideration of his equal protection claim by failing to raise it at his court-martial, by unconditionally pleading guilty, and by agreeing to waive all "waivable" motions in his pretrial agreement.

Ordinarily, motions not raised at trial and not preserved through a not guilty plea or a conditional guilty plea are waived. RULES FOR COURTS-

---

[2] The final assignment of error is raised by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

MARTIAL (R.C.M.) 905(e), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.). Jurisdictional defects are an exception to this general rule and are never waived. R.C.M. 905(b)(1). The appellee argues that the subject of the appellant's claim is equal protection, not jurisdiction. As we view the issue, however, it is plainly jurisdictional. It concerns the constitutionality of Article 2, UCMJ, the article that establishes which persons are subject to personal jurisdiction under the UCMJ. Since jurisdictional challenges are never waived—even by an unconditional guilty plea—the issue is appropriate for review. *United States v. Bradley*, 68 M.J. 279, 281 (C.A.A.F. 2010) (holding that an unconditional guilty plea waives only nonjurisdictional defects).

The appellee also argues that the appellant's pretrial agreement with the convening authority waives this issue on appeal. This argument is similarly unconvincing since the Rules for Courts-Martial prohibit any pretrial agreement term that purports to waive the accused's right to challenge the jurisdiction of the court-martial. R.C.M. 705(c)(1)(B). Accordingly, the appellant's jurisdictional claim is not waived.

We review jurisdictional claims de novo. *United States v. Wright*, 53 M.J. 476, 478 (C.A.A.F. 2000). We have authority to review the constitutionality of Article 2(a), UCMJ, (codified as 10 U.S.C. § 802(a)). *See United States v. Matthews*, 16 M.J. 354, 366 (C.M.A. 1983) ("we are sure that Congress intended for [the Court of Military Appeals] to have unfettered power to decide constitutional issues – even those concerning the validity of the Uniform Code.").

## B. This Constitutional Issue Cannot be Avoided

As a secondary issue, we must determine whether there is a way to resolve the appellant's jurisdictional claim without reaching the constitutional question. Two rules are relevant. The first, a procedural rather than interpretive rule, states that if a case can be decided by resort to statutory construction or general law, rather than constitutional law, it should be decided on the former grounds. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 247-51 (2012). The second is the canon of constitutional doubt, which requires us to interpret statutes in a way that avoids a constitutional question if such an interpretation is possible. *Gomez v. United States*, 490 U.S. 858, 864 (1989); *see also* Scalia & Garner, *supra* at 251. With these imperatives in mind, we have explored alternative interpretations and procedural approaches to the appellant's issue. We cannot find, and have not been presented with, any alternative resolution or reasonable alternative interpretation that permits us to avoid an equal protection analysis of the stark and facially inscrutable lines that Congress has drawn between classes of retired military personnel in Article 2.

**C. Members of the Fleet Reserve are Similarly Situated with Retired Members of the Regular and Reserve Components**

A predicate to an equal protection analysis is the existence of similarly situated groups of people who receive different treatment under the law. There is little case law to guide our determination of whether these two groups of retirees are "similarly situated" for equal protection purposes. We nonetheless feel confident determining that members of the Fleet Reserve, regular component retirees, and reserve component retirees are similarly situated because there is no meaningful distinction, legally or factually, between the groups that is relevant to good order and discipline in the armed forces.[3]

The Fleet Reserve is a type of retiree status unique to the Navy and Marine Corps.[4] Enlisted Sailors of the Navy who have completed at least 20 years of active service will be transferred to the Fleet Reserve at their request. 10 U.S.C. § 6330(b). Members of the Fleet Reserve have no military duties other than to "[m]aintain readiness for active service in event of war or national emergency" and to keep Navy authorities apprised of their location and "any change in health that might prevent service in time of war." Naval Military Personnel Manual, Art. 1830-040 (Ch-38, 19 Dec 2011). Fleet Reservists are entitled to "retainer pay." 10 U.S.C. § 6330(c)(1). Once a member of the Fleet Reserve has reached 30 years of service, they are entitled to transfer to the Navy's retired list. 10 U.S.C. § 6326(a).

With some exceptions—many of which concern disability retirements—members of the Fleet Reserve, regular component retirees, and reserve component retirees have all spent at least 20 years in the armed forces. All three groups include some members who have served in *both* the regular and the reserve components. The members of all three groups are in an inactive sta-

---

[3] Members of a reserve component on inactive duty training are subject to the UCMJ. Art. 2(a)(3), UCMJ. The appellant argues that members of a reserve component that are *not* on inactive duty training or active duty (reservists on active duty would be subject to the UCMJ under Art. 2(a)(1)) should also be considered similarly situated with the appellant for UCMJ jurisdictional purposes. We disagree, seeing obvious differences between retired personnel of the active and reserve components on the one hand, and reservists who are not currently performing any military duties, have not transferred to a retired status, and may not even be eligible to retire, on the other. In addition to finding that inactive reservists are not similarly situated with retirees, we can conceive of compelling reasons why Congress would not subject these reservists to UCMJ jurisdiction.

[4] The Marine Corps' analogue is called the Fleet Marine Corps Reserve.

tus and no longer perform any uniformed military duties. They are all subject to recall to active duty. They are ineligible for further promotion. They are entitled to retired pay at some point in their retired years. Retirees from an active component, including the Navy's Fleet Reserve, begin earning retired pay ("retainer pay" for the Fleet Reserve) immediately upon retirement. Retirees from a reserve component generally begin receiving retired pay at age 60. For all of them, once they are entitled to retired pay, the pay continues for the duration of their lives and increases according to a cost of living formula. Their retired pay is *not* contingent on their continued military usefulness. Their actual ability to contribute to the accomplishment of a military mission is completely irrelevant.

As we consider whether the three groups at issue are similarly situated, we look to each group's *current* degree of connectedness to the armed forces—not to *past* connections. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 22 (1955) (suggesting that retaining jurisdiction over former soldiers, with no relation to active components, would not improve discipline amongst the active ranks). Although not dispositive, the official Department of Defense (DoD) policy on the utilization of retirees informs our determination that these three groups are in fact similarly situated.

The DoD instruction on "Management of Regular and Reserve Retired Military Members" establishes policy and provides procedures for the activation and employment of retired members. Dep't of Def. Instr. 1352.01, Management of Regular and Reserve Retired Military Members (8 Dec. 2016) [hereinafter DODI 1352.01]. We first note that the instruction states that the Navy's regular component retired members includes members of the Fleet Reserve. *Id.*, at ¶ 3.1(a)(2). This is consistent with our determination that members of the Navy's Fleet Reserve are, in all relevant respects, retired for purposes of our equal protection analysis. This determination also reflects the reality in the fleet, where members of the Fleet Reserve refer to themselves as "retired" and have "retirement ceremonies" upon transfer to the Fleet Reserve. Finally, and most convincingly, the Fleet Reserve has to be considered similarly situated with regular component retirees when one considers that the Army, Air Force, and Coast Guard have no analogous category to the Fleet Reserve, yet retirement eligibility rules are uniform across the armed services.

We also find it relevant that in describing DoD's four-part policy on the utilization of retired members, the instruction makes no distinction between

retired members of the regular and reserve components.[5] Similarly, in describing the criteria for retiree mobilization, the instruction does not mention active or reserve component status as a criterion for mobilization.[6] This formal DoD policy comports with our own experience regarding how the various armed services seek to integrate their reserve components as seamlessly as possible with their active components.

Retired members of both the active and reserve components are similarly—though not identically—subject to involuntary recall to active duty. While unusual, retired members of both the active and reserve components may be involuntarily recalled to active duty by a service secretary. The secretary of a military department has authority to involuntarily order a retired member of a reserve component to active duty for the duration of a war or national emergency and for six months thereafter, provided that Congress has de-

---

[5] To wit:

> It is DoD policy that:
>
> a. *Regular retired members and members of the retired Reserve* may be ordered to active duty (AD) as needed to perform such duties as the Secretary concerned considers necessary in the interests of national defense as described in Sections 688 and 12301 of Title 10, U.S.C.
>
> b. *Regular retired members and members of the retired Reserve* must be managed to ensure they are accessible for national security and readiness requirements.
>
> c. *Regular and Reserve retired members* may be used as a manpower source of last resort after other sources are determined not to be available or a source for unique skills not otherwise obtainable.
>
> d. Directors of agencies that have Defense related missions . . . may identify military and federal civilian positions that are suitable for fill by *retired military members* in time of war or national emergency. . . .

DODI 1352.01 at ¶ 1.2(a)-(d) (emphasis added). Note that 10 U.S.C. § 12301 (referenced in para. 1.2(a)) places a statutory limitation on the involuntary activation of retired reservists to times when Congress has declared a time of war or national emergency and the secretary of the military department has made a finding that there are not enough qualified active reserves who are readily available.

[6] DODI 1352.01 at ¶ 3.2(c) ("As part of the criteria for deployment of individuals to specific mobilization billets, the Military Services will consider the criticality of the mobilization billet, the skills of the individual, and his or her geographic proximity to the place of mobilization.").

clared a time of war or national emergency and the secretary determines there are not enough qualified reserves in an active status. DODI 1352.01 at ¶ 3.3(b)(1); *see also* 10 U.S.C. § 12301. In contrast, the secretary of a military department has authority to involuntarily order a retired regular member to active duty "at any time to perform duties deemed necessary in the interests of national defense in accordance with Sections 688, 689, 690, and 12307 of Title 10, U.S.C." DODI 1352.01 at ¶ 3.3(b)(2).

While we have found no precedent in case law standing for the proposition that retired members of the active and reserve components are similarly situated, our conclusion is not entirely novel. During testimony on the proposed Article 2, UCMJ, before the House Armed Services Committee, Robert W. Smart, a professional staff member on the House of Representatives' Committee on Armed Services, noted with concern that the jurisdictional scheme would mean "treating two classes of people on the same retired list differently." *Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. on Armed Services,* 81st Cong. (1949) [hereinafter *UCMJ Hearing*], *reprinted in* William K. Suter, *Index and Legislative History: Uniform Code of Military Justice* 1261 (William S. Hein & Co. 2000) (1950). As we discuss below in our Equal Protection analysis, Congress ultimately tolerated the disparate treatment in order to accommodate differences in how the services managed retirees—differences that, as we will see, are no longer applicable. But we find that this bit of legislative history corroborates our sense that retirees of the reserve and active components are in fact similarly situated.

Based on these considerations, we are convinced that members of the Fleet Reserve, retired members of the regular components, and retired members of the reserve components are similarly situated for purposes of equal protection analysis.

**D. Equal Protection Analysis**

Congress has broad power under Article I, Section 8, clause 14 of the Constitution "[t]o make Rules for the Government and Regulation of the land and naval Forces." Pursuant to that grant of authority from the people, Congress has subjected the following categories of people to the UCMJ: active duty military personnel,[7] cadets and midshipmen,[8] military prisoners,[9] prisoners of

---

[7] Art. 2(a)(1), UCMJ.

[8] Art. 2(a)(2), UCMJ.

[9] Art. 2(a)(7), UCMJ.

war and certain other detainees,[10] members of government agencies when assigned to the armed forces,[11] and certain civilians under limited circumstances.[12] Article 2, UCMJ, also includes the following groups that are relevant to our equal protection analysis:

Art. 2(a)(3): Members of a reserve component while on inactive duty training.

Art. 2(a)(4): Retired members of a regular component of the armed forces who are entitled to pay.

Art. 2(a)(5): Retired members of a reserve component who are receiving hospitalization from an armed force.

Art. 2(a)(6): Members of the Fleet Reserve and Fleet Marine Corps Reserve.

The disparate treatment provided to retirees from the active and reserve components is plain on the face of Article 2. The appellant claims that the distinction violates his right to equal protection because Article 2 deprives him of his constitutional rights to free speech, grand jury indictment, and a jury of his peers, while preserving those rights for similarly situated retirees from reserve components.

There is no equal protection clause in the text of the Fifth Amendment, but in *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954), the Supreme Court determined that an equal protection guarantee exists in the amendment's Due Process clause. "In view of our decision that the Constitution prohibits the states from [violating the 14th Amendment's guarantee of equal protection], it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Id*. Thus, the Fifth Amendment's Due Process Clause also guarantees the right of equal protection to those affected by Federal statutes.

Court-martial jurisdiction has always been considered a special type of criminal jurisdiction significantly different from civil courts and responsive to the special needs of the armed forces that do not exist in civil society. "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." *Reid v. Covert*, 354

---

[10] Art. 2(a)(9), (13), UCMJ.

[11] Art. 2(a)(8), UCMJ.

[12] Art. 2(a)(10), (11), (12), UCMJ.

U.S. 1, 21 (1957). Military jurisdiction was always intended "to be only a narrow exception to the normal and preferred method of trial in courts of law." *Id.* Therefore, notwithstanding Congress' broad constitutional power, the Supreme Court has held that due to the perceived inadequacies of courts-martial compared to Article III courts, Congress must limit its exercise of court-martial jurisdiction to "*the least possible power adequate to the end proposed.*" *Quarles*, 350 U.S. at 23 (emphasis in original) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 230-31 (1821)).[13]

The appellant urges us to apply strict scrutiny to Congress' Article 2 jurisdictional scheme because he claims that the unequal treatment he received under Article 2 deprived him of fundamental rights. Strict scrutiny analysis requires the challenged statute to serve a "compelling governmental interest," and the means taken to be "narrowly tailored" to accomplish this goal. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

Counter-balancing the proposition that strict scrutiny is the appropriate level of review when fundamental rights are in the balance, we have a judicial duty to provide Congress with great deference when it legislates pursuant to its Article I, Section 8 powers. "[J]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Goldman v. Weinberger,* 475 U.S. 503, 508 (1986) (quoting *Rostker v. Goldberg,* 453 U.S. 57, 70 (1981)); *see also Solorio v. United States*, 483 U.S. 435 (1987).

We do not see any contradiction in performing a strict scrutiny analysis while providing Congress with great deference. Judicial deference "does not mean abdication." *Rostker*, 453 U.S. at 70. For instance, in *Nat'l Coal. for Men v. Selective Serv. Sys.,* 355 F. Supp. 3d 568 (S.D. Tex. 2019), the district court recognized that "the court's deference to Congress's 'studied choice' is potentially at its height" but still used intermediate-level scrutiny to analyze a gender-based equal protection challenge to Congress' decision to require males, but not females, to register for the Selective Service. *Id.*, at 580.

Equal protection case law supports the proposition that strict scrutiny is the appropriate level of judicial review of governmental action that impinges

---

[13] "There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution. Free countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *Quarles*, 350 U.S. at 22.

on a fundamental right. *Phyler v. Doe*, 457 U.S. 202, 217 n. 15 (1982) ("In determining whether a class-based denial of a particular right is deserving of strict scrutiny under the Equal Protection Clause, we look to the Constitution to see if the right infringed has its source, explicitly or implicitly, therein."); *see also United States v. Marcum*, 60 M.J. 198, 204-05 (C.A.A.F. 2004) (analyzing the nature and scope of the right identified by the Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003) and *Lawrence's* applicability to Article 125, UCMJ). When a law impinges upon the "exercise of a fundamental right," courts may treat the law as "presumptively invidious." *Plyler*, 457 U.S. at 216-17; *see also Quarles*, 350 U.S. 11 (1955) (invalidating a law that would subject a separated Service Member to court-martial jurisdiction, in spite of traditional deference to Congress on military matters).

Court-martial jurisdiction deprives a defendant of the right to a presentment of the charges to a grand jury under the Fifth Amendment.[14] It also denies a defendant his Article III[15] and Sixth Amendment[16] right to trial by a jury of his peers. "A service member has no right to have a court-martial be a jury of his peers, a representative cross-section of the community, or randomly chosen." *United States v. Dowty,* 60 M.J. 163, 169 (C.A.A.F. 2004) (citing *Ex parte Quirin*, 317 U.S. 1, 39-41 (1942)).

We are certain that these rights—explicitly described in the Constitution—constitute "fundamental rights" for equal protection purposes. In the context of determining the proper scope of court-martial jurisdiction, the Supreme Court has stated: "[I]n view of our heritage and the history of the adoption of the Constitution and the Bill of Rights, it seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right." *Reid v. Covert*, 354 U.S. 1, 9 (1957). "Trial by jury in a court of law and in accordance with traditional modes of procedure after an indictment by grand jury has served and remains one of our most vital barriers to governmental arbitrariness. These elemental procedural safeguards were embedded in our Constitution to

---

[14] "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces . . . ." U.S. CONST. amend. V.

[15] "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ." U.S. CONST. art. III, § 2, cl. 3.

[16] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. CONST. amend. VI.

secure their inviolateness and sanctity against the passing demands of expediency or convenience." *Id.* at 10.

We find that these rights are undoubtedly fundamental. The appellant was denied their protection by virtue of being subject to the UCMJ.

To avoid application of the strict scrutiny standard, the government contends that court-martial jurisdiction does not burden any fundamental right. Citing *United States v. Dowty*, 60 M.J. 163, 169 (C.A.A.F. 2004), the government argues that the rights to grand and petit juries are not fundamental rights because "Appellant, subject to court-martial jurisdiction, has no Sixth Amendment right to a jury chosen from a fair cross-section of the community. His argument for strict scrutiny review fails."[17] This argument, however, starts with the presumption that the appellant is subject to court-martial jurisdiction—the very notion he challenges here. That Article 2, UCMJ, subjects the appellant to court-martial jurisdiction does not alter the fundamental character of these rights for purposes of our analysis. Under the UCMJ as it then existed, neither Robert Toth nor Clarice Covert had a right to trial by jury. Yet in *Toth v. Quarles* and *Reid v. Covert* the Supreme Court's analysis began with the understanding that the rights to grand and petit juries are fundamental.[18]

Having concluded that fundamental rights are at stake, we must determine whether Article 2's different treatment of similarly situated retiree groups is narrowly tailored to advance a compelling government interest.

We find that the purpose of military justice is to maintain good order and discipline in the armed forces.[19] When Congress legislates in the field of military justice, its objective is to promote good order and discipline in the armed forces, which is undoubtedly a compelling governmental interest.

There is no doubt that Congress can lawfully subject military retirees to court-martial jurisdiction. *United States v. Dinger*, 76 M.J. 552, 557 (N-M. Ct. Crim. App. 2017) (relying on the fact that retired members are "part of the land or naval forces" to support continuing jurisdiction over retirees), *aff'd on other grounds*, 77 M.J. 447 (C.A.A.F. 2018), *cert. denied,* 139 S. Ct. 492

---

[17] Government Brief at 10.

[18] *See Toth*, 350 U.S. at 16 ("This right of trial by jury ranks very high in our catalogue of constitutional safeguards."); *Covert*, 354 U.S. at 9 ("[I]t seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right.").

[19] *See* MCM, Preamble, ¶ 3.

(2018); *see also United States v. Hooper*, 9 U.S.C.M.A. 637, 645 (C.M.A. 1958). The question for us is whether the jurisdictional scheme that Congress has created in Article 2 is narrowly tailored to its compelling interest in maintaining good order and discipline in the armed forces.

The legislative history of the creation of the UCMJ provides insight as to why Congress structured Article 2 the way it did.[20] We find that in creating the UCMJ in 1949, Congress was attempting to tailor the law's jurisdiction to two military services with different administrative structures.[21]

Prior to the adoption of the UCMJ, the Articles for the Government of the Navy and the Articles of War governed the separate justice systems of the Navy and Army, respectively. Each system was tailored to the specific needs of its service. In the Navy, retired members of the regular and reserve components were on the same retired list. All retirees were managed and paid by the Navy and amenable to jurisdiction under the Articles for the Government of the Navy. In the Army, on the other hand, regular retirees were administered by the Army and reserve retirees were administered by the Veteran's Administration. The Army did not consider its retired reservists as subject to the Articles of War. This discrepancy needed to be resolved by Congress in order to put the "U" in the UCMJ.

The solution was for the Navy to relinquish court-martial jurisdiction over retired reservists in order to be consistent with the Army:

> Mr. Smart.[22] It appears to me—I just cannot tell for certain—that this [draft Article 2] is a relaxation of jurisdiction over Navy retired officers on the retired list. Is that correct?
>
> Admiral Russel.[23] That is correct.
>
> Mr. Larkin.[24] That is correct.

---

[20] The current versions of the Article 2 subsections in issue here are nearly unchanged from their 1950 origins.

[21] While the Department of the Air Force was formed under the National Security Act of 1947, it derived from, and was structured most similarly to, the Army.

[22] Robert W. Smart was a Professional Staff Member on the House of Representatives' Committee on Armed Services.

[23] Rear Admiral George L. Russel, U.S. Navy, was testifying about the formation of a legal corps within the Navy.

[24] Felix Larkin was Assistant General Counsel in the Office of the Secretary of Defense.

Mr. Smart. You see the point there, Mr. Chairman, is that the physically retired Navy Reserve officer is on the same retired list as the regular officer of the Navy. The physically retired Army officer is certified to VA as being authorized to draw retirement pay—not retired pay but retirement pay.

So there has been a great difference in the past as between physically retired Navy Reserves and Army retired Reserve officers. I just wanted to make certain here that the Navy was relinquishing courts-martial jurisdiction over retired reserve officers. And they say that that is correct.

*UCMJ Hearing, supra*, at 868.

The inequity of subjecting active, but not reserve, retirees to court-martial jurisdiction was not lost on the House of Representatives committee staff:

Mr. Smart. I am reluctant to say, Mr. Chairman, what my recommendation [regarding jurisdiction over retirees] would be.

I would point this one thing out to you: It seems a little inconsistent to me that retired personnel of a Regular component are subject when as a matter of fact you have non-Regular personnel in the Navy who are on the same retired list and entitled to the same rights and benefits as the regular.

The Navy apparently here has waived their right to their jurisdiction, so that the retired non-Regular Navy officer, even though he is on the retired list of the Navy will not be any more subject to the code than the non-Regular Army officer who is drawing retirement pay from the Veteran's Administration.

It is treating reserves alike, I will admit, but it is treating two classes of people on the same retired list differently too.

*Id.* at 1261.

The Committee Report from the House of Representatives succinctly laid out the rationale for the difference in treatment:

Paragraph (5) [draft Article 2(a)(5), UCMJ] represents a lessening of jurisdiction over retired personnel of a Reserve component. Under existing law, the Navy retains jurisdiction over retired Reserve personnel since such personnel are on the same retired list as members of a regular component. The Army has no such jurisdiction since retirement benefits for non-regular officers are administered by the Veteran's Administration. This paragraph relinquishes jurisdiction over its Reserve

> personnel except when they are receiving hospitalization from an armed force. This standardizes jurisdiction of the armed forces over Reserve personnel.

H.R. Rep. No. 81-491, at 10 (1949) *reprinted in* Suter, *supra*. An identical explanation appeared in the corresponding Senate report. S. Rep. No. 81-486, at 7 (1949) *reprinted in* Suter, *supra*.

If Article 2 was originally tailored by Congress, however awkwardly, to the administrative needs of the Army and Navy, it appears that those needs no longer exist. Instead, it appears that each service now manages and administers its own reserve retirees. *See, e.g.,* 10 U.S.C. § 12731(b) ("Application for [non-regular] retired pay under this section must be made to the Secretary of the military department, or the Secretary of Homeland Security, as the case may be, having jurisdiction at the time of application over the armed force in which the applicant is serving or last served"). *See also* 10 U.S.C. § 12731(f)(3) ("The Secretary concerned shall periodically notify each member of the Ready Reserve . . . of the current eligibility age for retired pay of such member under this section, including any reduced eligibility age by reason of the operation of that paragraph. Notice shall be provided by such means as the Secretary considers appropriate taking into account the cost of provision of notice and the convenience of members."). Each service now administers its retirees, both active and reserve.

Furthermore, we find that the structure of Article 2 jurisdiction over current retirees is not narrowly tailored to the compelling government interest in maintaining good order and discipline in the armed forces. UCMJ jurisdiction is simply not related to a retiree's connectedness to the armed forces or ability to effectively contribute to military missions. An elderly and infirm active component retiree is less likely to be able to contribute to the accomplishment of military missions than a middle-aged reserve component retiree in good health. Yet, the active component retiree of questionable military utility may be court-martialed for violations of the UCMJ, and suffer the deprivation of fundamental rights that such jurisdiction entails, while a younger and more physically fit reserve component retiree is immune from UCMJ jurisdiction.

Article 2(a)(4) states that a retired member of a regular component "entitled to pay" is subject to the UCMJ. Such language indicates that Congress may have viewed entitlement to pay as a useful criterion for determining UCMJ jurisdiction. Entitlement to pay fails entirely as a narrowing criterion, however, because many reserve component retirees are also entitled to pay

15

and yet remain outside UCMJ jurisdiction.[25] The retired pay structure for reservists is also completely disconnected from a reservist's actual ability to contribute to military missions. Indeed, for reserve component retirees the relationship between entitlement to pay and military utility is essentially inverted. When a reserve retiree is younger, they are more likely to be able to withstand the physical rigors of active military service and less likely to be receiving retired pay. When older, they are more likely to be receiving retired pay and less likely to be militarily useful. For both regular and reserve retirees, once they are entitled to retired pay, the entitlement continues for the duration of their lives and increases according to a set formula. Neither's retired pay is contingent on their continued military usefulness. We find that entitlement to pay does not help tailor Article 2's jurisdictional scheme to Congress' compelling interest in maintaining good order and discipline in the armed forces.

Our review indicates that Article 2 is not narrowly tailored to the achievement of a compelling government interest. Instead, it appears that Article 2's retiree jurisdiction structure is an anachronistic vestige of Congress' effort to create a *uniform* code of military justice for military services that traditionally had different administrative needs. Article 2's retiree jurisdiction rules reflect an administrative compromise that has outlived its necessity and is not tailored to current governmental interests.

It is clear to us that Congress could lawfully subject *all* retirees of the armed forces to UCMJ jurisdiction. Conversely, it could subject *no* retirees of the armed forces to jurisdiction. It could also narrowly tailor retiree jurisdiction in such a way to satisfy the compelling interest in maintaining good order and discipline in the armed forces. Article 2 as structured, however, is not narrowly tailored to that interest. Accordingly, we find that the UCMJ's jurisdictional structure for retirees violates the right of equal protection imputed to the Fifth Amendment.

## III. CONCLUSION

After careful consideration of the record and briefs and oral argument of appellate counsel, we hold that Articles 2(a)(4) and 2(a)(6) of the UCMJ violate the Due Process Clause's guaranty of equal protection of the laws and

---

[25] Retirees from a reserve component are generally entitled to retired pay, but they do not start receiving it until age 60. Some retired reservists can earn retired pay as early as age 50 if they qualify under rules that reduce the age at which they start receiving pay. *See* 10 U.S.C. § 12731(f).

are therefore unconstitutional. Accordingly, the findings and sentence as approved by the convening authority are **DISMISSED**.

Senior Judges FULTON and HITESMAN concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court